IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DR. WENDI H. ANDERSON,

        Plaintiff,

v.                                                                          Civil Action No. 3:18cv745

THE SCHOOL BOARD OF GLOUCESTER
COUNTY, VIRGINIA, *et al.*,

        Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Defendants the School Board of Gloucester

County (the "School Board"), Patricia J. McMahon ("Dr. McMahon" or "McMahon"), and

Gwyn H. Ciemniecki's (collectively with McMahon and the School Board, the "Defendants")

Motion to Dismiss brought pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

(ECF No. 11.)  Plaintiff Wendi H. Anderson ("Dr. Anderson" or "Anderson") responded, (ECF

No. 13), and Defendants replied, (ECF No. 14).  This matter is ripe for disposition.  The Court

exercises jurisdiction pursuant to 28 U.S.C. § 1331[2] and supplemental jurisdiction pursuant to 28

---

[1] Rule 12(b)(1) allows dismissal for "lack of subject-matter jurisdiction." Fed. R. Civ. P.
12(b)(1). Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be
granted." Fed. R. Civ. P. 12(b)(6).

[2] "The district courts shall have original jurisdiction of all civil actions arising under the
Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Dr. Anderson brings
multiple claims under several federal statutes including the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12112, *et seq.*, the Family and Medical Leave Act of 1993 ("FMLA"), 29
U.S.C. § 2601, *et seq.*, and 42 U.S.C. § 1983, meaning her action arises under the laws of the
United States.

U.S.C. § 1367.[3] For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion to Dismiss.

## I. Factual and Procedural Background

Dr. Anderson, a teacher at Page Middle School ("Page") located in Gloucester County, Virginia, brings this eight-count Amended Complaint arising out of Dr. McMahon, Ciemniecki (collectively, the "Page Administration") and the School Board's alleged failure to provide reasonable accommodations for Dr. Anderson's scent sensitivity and allergies after they had previously done so. The Amended Complaint brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*,[4] the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*,[5] 42 U.S.C. § 1983,[6] and Virginia law.

---

[3] The Court exercises supplemental jurisdiction over Dr. Anderson's state law claims of nuisance, battery, gross negligence, conspiracy, and defamation *per se* pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.").

[4] The ADA makes it illegal for any:

> covered entity [to] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

[5] The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. §2615(a)(1). The FMLA provides, among other rights, a total of twelve (12) workweeks of leave during any one year to an eligible employee "unable to perform the functions of [his or her] position" due to "a serious health condition." 29 U.S.C. § 2612(a)(1)(D).

[6] Title 42, Section 1983 of the United States Code states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

2

## A. **Factual Allegations**[7]

The School Board supervises all public schools in Gloucester County, including Page. (Am. Compl. ¶ 2, ECF No. 9.) Dr. McMahon currently serves as the Principal of Page and Ciemniecki "is the Executive Director of Human Resources [and] Compliance for the Gloucester County Public Schools." (*Id.* ¶¶ 3–4.) Since 2006, Gloucester County Public Schools has employed Dr. Anderson as a teacher. (*Id.* ¶ 1.) During the 2017–18 school year, the time period underlying the Amended Complaint, "Anderson taught Eighth Grade English and Language Arts at Page." (*Id.*)

Dr. Anderson suffers from a "sensitivity [and] allergy to scents, including perfumes and topicals that contain vanilla, cocoa butter, flora/fruits, musks, patchouli (mint), body sprays,

---

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress , . . . injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

[7] For the purpose of the Rule 12(b)(6) Motion to Dismiss, the Court will accept the well-pleaded factual allegations in Dr. Anderson's Amended Complaint as true, and draw all reasonable inferences in favor of Anderson. *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

Under 12(b)(1), when a defendant asserts that the complaint fails to state a claim upon which subject matter jurisdiction can lie, the Court assumes the truth of the facts alleged by plaintiff. *See Int'l Longshoremen's Ass'n, S.S. Clerks Local 1624, AFL-CIO v. Virginia Int'l Terminal*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). In several parts of the Motion to Dismiss, the Defendants challenge whether Anderson has stated a claim upon which jurisdiction can lie. Defendants do not successfully challenge jurisdiction on these facts, instead challenging the power of this Court to hear the case. Therefore, the Court will assume the truth of the facts alleged by Anderson for all claims in the Amended Complaint.

lotions and hand sanitizer." (*Id.* ¶ 10.) She alleges that her exposure to these scents causes her to experience multiple physical reactions, some of which are immediate and some of which "[w]orsen[]. . . [w]ith successive exposures." (*Id.* ¶ 20.) Dr. Anderson reports, among other reactions, experiencing "[p]ain in the throat and mouth," "[d]ifficulty breathing," "[c]oughing," "[c]ognitive dysfunction," "[d]iarrhea," "[b]lurry vision," "[m]igraines," the "[n]eed to leave class to take antihistamines and other supplements," the need to "[t]each with [her] face covered," and the need to "[w]ear multiple masks to reduce exposure, without success." (*Id.* ¶ 20.)

Prior to the 2017–18 school year, the School Board adopted and enforced a scent sensitivity policy (the "Scent Policy")[8] in Dr. Anderson's classroom. (*Id.* ¶ 11.) Under the Scent Policy, the former principal of Page permitted Anderson "to inform students about her sensitivity/allergy . . . and a letter/note was sometimes distributed to parents." (*Id.*) "Pursuant to the [Scent Policy], both . . . Anderson and Page Administration interacted with parents in the event of a violation of the policy by a student." (*Id.*) Anderson and the Page Administration could also discipline students based on an "intentional and flagrant violation" of the Scent Policy, and in one instance, the administration suspended a student for ten days. (*Id.*)

During the time the Scent Policy was in effect, Dr. Anderson alleges that she received positive feedback on her performance reviews at Page. (*Id.* ¶ 13.) For instance, in her performance review following the 2011–12 school year, the former principal of Page rated her as having achieved "mastery" in one category and "professional" in the remaining categories; she

---

[8] Dr. Anderson refers to an earlier Scent Policy, but does not append to her Amended Complaint a written copy of any Gloucester County School Board Scent Policy (to the extent one exists). She does, however, attach what she describes as a scent free policy from Jefferson County Public Schools, (Am. Compl., Ex. D, ECF No. 9-4), and one from the Gloucester County Department of Parks and Recreation, (Am. Compl., Ex. E, ECF No. 9-5).

did not receive a "needs improvement" rating in any category. (*Id.*) In 2015, Anderson submits that she achieved a rating of "mastery" in several additional categories along with positive performance comments. (*Id.*)

Before the 2017–18 school year, Dr. Anderson planned to advise parents about her sensitivity and allergies during an open house. (*Id.* ¶ 15.) She sent Principal McMahon an email with a proposed note that she planned to share with parents, "as she had done many times in the past," detailing her various sensitivities and asking students to refrain from wearing products with certain scents. (*Id.*) The next day, Dr. McMahon responded, suggesting that Anderson "not define that you are the person with the allergy" because "your information is private, and you do not need to share it with parents or students." (*Id.*) McMahon suggested alternatives, such as: hanging allergy awareness signs outside the classroom; including on the syllabus that the classroom is an "allergy awareness classroom;" letting students know they should "be aware" of scents and perfumes; and, listing specific scents for students to be aware of if Anderson submitted a doctor's note to the Page Administration. (*Id.*) McMahon also offered to send someone to present information about allergies to Anderson's classroom at the start of the academic year. (*Id.*)

In response to Dr. McMahon's email, Dr. Anderson provided letters from health care providers confirming her sensitivity. (*Id.* ¶ 16.) Anderson also sent McMahon a list of requested accommodations. (*Id.* ¶ 17.) Anderson alleges that, in response, the "School Board and McMahon refused the accommodations requested by Dr. Anderson and recommended by her health care providers." (*Id.*) Seemingly by email, Dr. Anderson confirmed that Dr. McMahon told Anderson that: (1) she was not allowed to say anything about her specific allergies to students; (2) she could not communicate with students about her allergies except through Dr.

5

McMahon and the school nurse; (3) she could not ask a student to relocate even if that student was wearing a scent that made breathing difficult; and, (4) her "only option" in the event of an allergy attack was "to remove [herself] from the classroom." (*Id.*) As an explanation for the prohibition against allowing Anderson to give examples of her allergies, Ciemniecki replied that "'it's rude to tell someone that you are allergic to what they are wearing. It's like saying they have B.O.'" (*Id.* ¶ 19) (emphasis in original).

During the first five days of the 2017–18 school year, Dr. Anderson experienced four allergic reactions including one of "the worst response[s] to scents she had ever had in her life." (*Id.* ¶ 28.) Beginning in September 2017, a Virginia Education Association ("VEA") representative and Dr. Anderson met with Dr. McMahon and Ciemniecki several times to discuss reasonable accommodations for Anderson. (*Id.* ¶ 19.) Anderson submits that in the event of an allergic reaction, she was permitted only to move the class, put on her mask, ask a student to pass work over, or leave class herself and go to the nurse. (*Id.*) When McMahon asked Anderson "why she had not availed herself of the option of leaving class and going to see the nurse," Anderson replied that: "the accommodations are supposed to allow Dr. Anderson to continue to perform her duties as a [t]eacher (not to remove her from duty) and because her allergic reactions sometimes last for days at a time, it was not reasonable to go see the nurse." (*Id.*)

The conflict over Dr. Anderson's allergies continued throughout the 2017–18 school year during which "Dr. Anderson continually advised McMahon and Ciemniecki that the School Board's refusal to reasonably accommodate Dr. Anderson was causing serious injury." (*Id.* ¶ 21.) Dr. Anderson alleges that discrimination occurred in the following circumstances:

1. Dr. McMahon did not allow Dr. Anderson to address students about the school rule "that no one can wear 'strong scents.'" (Am. Compl. Ex. A, 1, ECF No. 9-1.)

2. Dr. McMahon did not allow Dr. Anderson to send a student wearing a strong scent to the flexible classroom space outside her classroom to move the scent out of the classroom. (*Id.*)

3. Dr. McMahon did not allow Dr. Anderson to move her classroom to the common area "to allow more air and a less confined space."[9] (*Id.*)

4. Dr. McMahon did not allow Dr. Anderson to "speak to the students at will and engage in disciplinary measures about . . . purposeful repeated disruptive use of scents." (*Id.* 2.)

5. Dr. McMahon did not allow Dr. Anderson "to call [a student's] home at will for . . . purposeful repeated disruptive use of scents."[10] (*Id.*)

6. Dr. McMahon did not allow Dr. Anderson to call home "about disruptive and disrespectful behavior for students once they began purposeful repeated or disruptive use of scents." (*Id.*)

7. Although other teachers could, Defendants did not allow Dr. Anderson to "personally ask students on a case by case basis about scents or sprays that irritated [her] physical conditions." (*Id.*)

8. "A teacher with Mast Cell Activation Disorder was allowed to remove from the classroom and discipline a student who repeatedly wore a scent that she had told her irritated the teacher's condition." Defendants did not allow Anderson to do the same. (*Id.*)

9. Defendants did not protect Anderson based on her sensitivity and allergies in the same way they might protect a student with an allergy. (*Id.* 3.)

In addition to these alleged discriminatory acts, Dr. Anderson contends that her treatment by the School Board and the Page Administration did not align with her quality of performance.

---

[9] "After school on September 7, 2017, this ban was lifted with the justification that all teachers could use the space for any reason." (Am. Compl. Ex. A., 1.)

[10] In an October 4, 2017 email, Dr. McMahon explained "Dr. Anderson, if you have experienced a reaction because you have smelled something unbearable on a particular student, you may speak to the student using the scent. You may also contact that student's parent." (Am. Compl. ¶ 22.)

First, without elaboration, Dr. Anderson alleges that Dr. McMahon falsely accused her of violating the Family Education Rights and Privacy Act ("FERPA").[11] (Am. Compl. ¶ 25.) According to Anderson, McMahon also "criticized . . . Anderson for failing to turn in plans for substitute teachers and for being 'absent again.'" (*Id.*) McMahon also filed letters of reprimand in Anderson's file for "contacting the [school resource officer] and other . . . matters, such as having a bag of herbal supplements to help with her allergic reactions." (*Id.*) Additionally, the School Board and McMahon put Anderson on a "pretextual performance improvement plan ('PIP')." (*Id.* ¶ 27.)

Dr. Anderson futher charges that Dr. McMahon and Ciemniecki made statements and published information to third parties regarding Anderson.[12] (*Id.* ¶ 59.) Specifically, Anderson asserts that McMahon made five statements and Ciemniecki made one statement. First, on September 26, 2017, McMahon sent an email to unidentified recipients stating, "[a]s I have stated previously, I fear that Wendi Anderson will do or say something that will harm the students in her care. I have lost faith in her ability to keep students safe."[13] (*Id.*) Second, on October 15, 2017, McMahon accused Anderson of engaging in a "pattern of unprofessional behavior." (*Id.*) McMahon made this accusation to unspecified recipients. (*Id.*) Third, in

---

[11] The Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, *et seq.*, "prohibit[s] the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 276 (2002).

[12] Dr. Anderson does not identify to whom emails were published in every instance. She does, however, include as recipients Chuck Wagner (Assistant Superintendent for Instructional Services on the Gloucester School Board), Jesse Dutton (Assistant Principal at Page), Craig Smith, Julie Harris, Laurie Greisz, Lydia Gilbert, and Heather Lucas.

[13] The emails contained in the Amended Complaint from McMahon and Ciemniecki contained extraneous symbols, such as several "=" signs. To enhance readability, those extraneous symbols have been removed.

February 2018, McMahon placed Anderson on a performance improvement plan, stating she had "deficits in Standard 2, Standard 3, Standard 5 and Standard 6"[14] on her performance evaluation. (*Id.*) Fourth, on March 12, 2018, McMahon sent an email to Chuck Wagner, the Assistant Superintendent for Instructional Services on the Gloucester County School Board, in which she stated, "this teacher [Anderson] tends not to plan things well."[15] (*Id.*) Fifth, on an unspecified date, Ciemniecki sent an email to "McMahon and others" stating "[w]e wish her well with her 'way worse illness and keep it moving . . . .'" (*Id.*) Finally, on April 18, 2018, McMahon sent an email to Ciemniecki and others, stating that:

> Wendi has not reported any incidents to administration, the school nurse, or main office staff. . . . She has not chosen to follow the recommendations nor she has requested supports or accommodations for many months. She has not reported at any time that she has been in distress. She has not seen the school nurse. . . . [u]nfortunately, we will have no documentation at school to support her report.

(*Id.*) Dr. Anderson alleges that Dr. McMahon and Ciemniecki coordinated their allegedly defamatory statements to third parties regarding Anderson. (*Id.* ¶ 55.) Anderson contends that on September 8, 2017, McMahon sent an email to Ciemniecki stating "I'm putting my narrative documentation to date into the pony for you . . . I will email you the narrative again on Tuesday (to include anything potentially new)." (*Id.* ¶ 55.)

From September 5, 2017, to October 5, 2017, Dr. Anderson states that she "had approximately seventy-five (75) reactions in school." (*Id.* ¶ 28.) Anderson alleges she could no longer perform her primary duties because the reactions to scents on students caused numerous

---

[14] Dr. Anderson does not identify what these standards address.

[15] Dr. Anderson alleges the statement about her planning ability is false because on January 26, 2018, Dr. McMahon sent an email to Anderson that stated "Thank you, Wendi for the work you have done to schedule . . . and reschedule the Stop, Drop & Write assessment. We appreciate the planning and work you have done." (Am. Compl. 30 n.4.)

health conditions, including pain in the throat and mouth, difficulty breathing, cognitive disfunction, and migraines. (*Id.*)

Rather than accommodating her disability, Dr. McMahon and Ciemniecki, among other improper responses, "informed Dr. Anderson that her health was 'not Gloucester's concern'; [said] 'we want you to get over this'; [and] 'you need to figure out how to teach.'" (*Id.* ¶ 27.)

Toward the end of the 2017–18 school year, Dr. Anderson's ability to teach had deteriorated. (*Id.* ¶ 20.) In April 2018, Anderson "was forced to seek leave under the FMLA due to ongoing, severe allergic reactions." (*Id.* ¶ 26.) Anderson provided a note from her health care provider documenting her need. (*Id.*) The School Board granted Anderson's request for leave. (*Id.*) After the School Board granted her request for FMLA leave, Anderson claims the Page Administration improperly subjected her to the following actions:

1. "She was removed from the employee mailing list for months;"

2. "Her key to Page was deactivated without notice;"

3. "She was denied access to her student rosters and gradebook;"

4. "Accounts were removed with access to her students' testing data;"

5. "She was ordered to remove her personal belongings;"

6. "She was ordered (via a school secretary on the phone) to turn in her key and computer so that a substitute could have them;" and,

7. "She was refused access to her state testing results of individual students."

(*Id.* ¶ 41.) Dr. Anderson adds that her "classes' overall reading comprehension growth . . . was exceptional." (Am Compl. ¶ 27.) Anderson asserts that because of Defendants' actions, she has

"become permanently disabled" and "may never be able to teach in a classroom again." (*Id.* ¶ 28.)

On June 27, 2018, because of the alleged discrimination Dr. Anderson experienced due to her sensitivity and allergies, Anderson filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 8.) On August 2, 2018, Anderson received a Right-to-Sue letter from the EEOC, (the "Right-to-Sue Letter"). (*Id.*) The Right-to-Sue Letter advised Anderson that her lawsuit "must be filed within 90 days of your receipt of this notice; or your right to sue based on this charge will be lost." (*Id.*) On October 30, 2018, Anderson filed this suit.

### B.  Procedural Background

On October 30, 2018, Dr. Anderson filed her original Complaint in this Court. (Compl., ECF No. 1.) The Complaint spanned thirty-three (33) pages and raised eight counts, many with embedded sub-claims. (*Id.*) Defendants jointly filed a Motion to Dismiss for failure to state a claim. (First Mot. Dismiss, ECF No. 7.) The twenty-nine (29) page Motion to Dismiss sought dismissal of the entire Complaint, raising multiple bases for dismissal including untimeliness, improperly named individual defendants, wrongly duplicative claims under the ADA and § 1983, and, as to multiple claims, failure to state a claim upon which relief can be granted. (Mem. Supp. Mot. Dismiss, *passim*, ECF No. 8.) Dr. Anderson then filed the Amended Complaint as a matter of right. (Am. Compl.) The Amended Complaint duplicated the original nearly in toto; only paragraphs eight and nine were altered. (*See id.* ¶¶ 8–9.) In those two paragraphs, the Amended Complaint added allegations as to timeliness, as to Anderson's ability to perform the essential functions of her job with reasonable accommodation, and as to relief (clarifying that she sought a scent-free accommodation rather than "a mandatory scent-free zone"). (*Id.*) Without

citing any legal principle allowing her to do so, Dr. Anderson also appended five exhibits to the Amended Complaint, including an exhibit that appeared to contain additional factual allegations in support of the counts in Amended Complaint. (Am. Compl., Ex. A.)

In response, Defendants jointly filed the instant twenty-nine (29) page Motion to Dismiss for failure to state a claim and for lack of jurisdiction. (Second Mot. Dismiss.) The arguments for dismissal in large part repeat those filed in the first Motion to Dismiss, although Defendants attach one new exhibit which purportedly contained emails between Dr. Anderson and Dr. McMahon. (Second Mot. Dismiss, Ex. 1.)

Dr. Anderson's thirty-five (35) page Amended Complaint brings eight counts against the three Defendants. Reading her claims broadly, (because many "claims" appear—improperly—in the statement of facts or the exhibits attached to the Amended Complaint), Anderson asserts her claims in the Amended Complaint as follows, alleging that:

| | |
|---|---|
| **Count I:** | Defendants violated the ADA by: (1) failing to provide Anderson with reasonable accommodations for her disability; (2) discriminating against Anderson through disparate treatment; (3) retaliating against Anderson for invoking her ADA rights; and, (4) violating § 1983; |
| **Count II:** | Defendants violated the ADA by: (1) harassing Anderson and creating a hostile work environment; and, (2) violating § 1983; |
| **Count III:** | Defendants violated the FMLA by: (1) interfering with Anderson's FMLA rights; (2) retaliating against Anderson for invoking her FMLA rights; and, (3) violating § 1983; |
| **Count IV:** | McMahon and Ciemniecki's policy of allowing the physical presence of scents in Anderson's classroom constituted nuisance in violation of Virginia law; |
| **Count V:** | McMahon and Ciemniecki's policy of allowing students to wear scents in Anderson's classroom resulted in battery against Anderson in violation of Virginia law; |
| **Count VI:** | McMahon and Ciemniecki's actions and omissions in exposing Anderson to scents was grossly negligent in violation of Virginia law; |

**Count VII:** McMahon and Ciemniecki, acting in concert together, conspired to commit defamation in violation of Virginia law; and,

**Count VIII:** McMahon and Ciemniecki made and published false statements regarding Anderson, committing defamation *per se* in violation of Virginia law.

As relief, Dr. Anderson seeks $1,500,000 in compensatory damages, $350,000 in punitive damages, pre and post-judgment interest, expert witness fees, and attorneys' fees and costs. (Am. Compl. 33–34.). The claims for relief in the two complaints are identical.

## II.  Standards of Review

### A.  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S.

13

at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific

and requires "the reviewing court to draw on its judicial experience and common sense."

*Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true

and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give

rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467

(finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of

the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of

the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to

factual allegations, however, and "a court considering a motion to dismiss can choose to begin

by identifying the pleadings that, because they are no more than conclusions, are not entitled to

the assumption of truth." *Iqbal*, 556 U.S. at 679.

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency

of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal

nevertheless is appropriate when the face of the complaint clearly reveals the existence of a

meritorious affirmative defense." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013)

(quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011)).

**B.    Rule 12(b)(1)**

Federal district courts are courts of limited subject matter jurisdiction. *United States ex*

*rel. Vuyvuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Exxon Mobile Corp. v.*

*Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005)). This Court must, as a result, determine

whether it has jurisdiction over the claims at issue. *See Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold

matter 'spring[s] from the nature and limits of the judicial power of the United States' and is

'inflexible and without exception.'") (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation . . ." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1)).

In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenging the Court's subject matter jurisdiction, the burden rests with the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams*, 697 F.2d at 1219). A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) can attack subject matter jurisdiction in two ways. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). First, a Rule 12(b)(1) motion may attack the complaint on its face, asserting that the complaint fails to state a claim upon which subject matter jurisdiction can lie. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. In such a challenge, a court assumes the truth of the facts alleged by plaintiff. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219.

Alternatively, a Rule 12(b)(1) motion may also challenge the existence of subject matter jurisdiction in fact, apart from the pleadings. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. In such a case, because a party challenges the court's "'very power to hear the case,'" the trial court is free to weigh evidence to determine the existence of jurisdiction. *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not

preclude the trial court from evaluating for itself the merits of jurisdictional claims. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219.

Here, in several instances, the Motion to Dismiss attacks Anderson's Amended Complaint on its face, asserting that it fails to state a claim upon which subject matter jurisdiction can lie. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. Therefore, when considering the Motion to Dismiss under Rule 12(b)(1), the Court will assume the truth of the facts as alleged by Anderson. *See id.*

## C.   Effects of Extrinsic Documents

"If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). However, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion into one for summary judgment] so long as the authenticity of these documents is not disputed." *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (citations omitted). "[I]n the event of conflict between the bare allegations of the complaint and any attached exhibit . . . , the exhibit prevails." *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

## III. Analysis: Statute of Limitation and Federal Claims

Defendants first contend that Dr. Anderson brings her Amended Complaint on an untimely basis. Because the Court will not decide that issue on this record, it will turn to her

substantive claims. Anderson brings both federal and Virginia state law claims in the Amended

Complaint. After addressing the statute of limitations defense, the Court will address Dr.

Anderson's federal claims and will then turn to her claims brought under Virginia law.[16]

---

[16] The Court will consider whether Anderson's thirty-five (35) page Amended Complaint survives under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), but pauses to note the convoluted nature of many of her claims and the Amended Complaint generally.

Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Courts have long noted "that a complaint that is prolix and/or confusing makes it difficult for the defendant to file a responsive pleading and makes it difficult for the trial court to conduct orderly litigation." *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 775–76 (7th Cir. 1994). Similarly, Rule 8(d)(1) "specifies that each averment of a pleading is to be simple, concise, and direct." *Michaelis v. Nebraska State Bar Assoc.*, 717 F.2d 437, 438 (8th Cir. 1983) (citing former Rule 8(e)). Needlessly convoluted and prolix complaints may harm the efficient administration of justice and make "an orderly trial impossible." *Id.* at 439.

With an earlier motion to dismiss in hand, Dr. Anderson brings forty-one (41) claims against the three defendants in this matter. As will be explained in the analysis below, forty (40) of those claims falter on legal doctrines and rules that, for the most part, are well established in the United States Court of Appeals for the Fourth Circuit and the Commonwealth of Virginia. In many instances, they fail for reasons raised in the First Motion to Dismiss and repeated in the instant motion. Rather than support each claim with precise factual allegations, Counsel for Anderson again has scattered factual allegations throughout the Amended Complaint. Without explaining how he can do so under the Federal Rules, Counsel for Anderson has attached a supporting document to the Amended Complaint (which Anderson seemingly wrote herself) that contains additional factual allegations, untethered to any of the 41 claims brought in the Amended Complaint. (*See* Am. Compl., Ex. A.) And Anderson changed only two paragraphs in the Amended Complaint. These minor changes, continued spattering of information, and otherwise prolix nature of the Amended Complaint and appended documentation make it difficult for the Defendants and the Court to identify Anderson's claims for relief and to "conduct orderly litigation." *Vicom, Inc.*, 20 F.3d at 776.

In the interest of justice the Court allows the litigation to proceed on an already Amended Complaint. But because this Amended Complaint is a *second* opportunity after Defendants' first motion to dismiss, the Court will not allow Anderson leave to amend. The Court also admonishes Counsel for Anderson to ensure that any future claims for relief are supported by "a *short* and *plain* statement of the claim showing that the pleader is entitled to relief" in "simple, direct, [and] concise language." Fed. R. Civ. P. 8(a) and (d) (emphases added). Going forward, Counsel for Anderson is admonished to ensure that all positions, including those in briefing and in support of discovery, "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Failure to do so could result in sanctions.

A.    **The Court Will Allow Discovery as to Whether or Not Dr. Anderson Filed**
      **Her Complaint Within the Statute of Limitations**

As to Count I, the Defendants contend that Anderson's claims are time-barred. The ADA

requires a plaintiff to file a complaint in federal court within 90 days of the receipt of a right-to-

sue letter[17] issued by the EEOC. 42 U.S.C. §§ 2000e-5(f)(1), 12117(a). The Amended

Complaint does not allege when the EEOC mailed the Right-to-Sue Letter. Anderson asserts

that she received the letter on August 2, 2018. (Am. Compl. ¶ 8.) Anderson filed the present

suit eighty-nine (89) days after she says she received the Right-to-Sue Letter.

The Defendants argue that a presumption exists that a right-to-sue letter was received

three days after the EEOC mailed it. In their Reply, Defendants append a full copy of the Right-

to-Sue Letter which shows July 26, 2018 as the "Date Mailed." (Reply Second Mot. Dismiss,

Ex. 1.) A plaintiff must file suit within 90 days of receipt of the notice.[18] 42 U.S.C. §§ 2000e-

---

[17] A right-to-sue letter, EEOC Form 161, informs the employee of the reason the EEOC
declined to proceed against the offending employer and contains a "Notice of Suit Rights"
section, which informs the petitioner of her or his right to bring suit against the offending
employer. U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC FORM 161: DISMISSAL AND
NOTICE OF RIGHTS (2009),
https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/foia/forms/form_161.pdf
          Dr. Anderson did not attach a full copy of the EEOC Notice to her Complaint, but
Defendants attached it as an exhibit to the Reply Memorandum in Support of the Motion to
Dismiss. (Reply Second Mot. Dismiss, Ex. 1, "EEOC Notice 1," ECF No. 14-1.) The Court
may consider the EEOC Notice as a "document[] central to plaintiff's claim and [a] document[]
sufficiently referred to in the complaint" because Anderson does not dispute the authenticity of
the EEOC Notice. *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006).

[18] EEOC Form 161, entitled "Dismissal and Notice of Rights," states the reason or
reasons why the EEOC closed its file into the petitioner's charge without taking action against
the offending employer and includes a "Notice of Suit Rights." U.S. EQUAL EMP'T
OPPORTUNITY COMM'N, EEOC FORM 161: DISMISSAL AND NOTICE OF RIGHTS. The Notice of
Suit Rights included on Form 161 states, in relevant part:

      [T]he Americans with Disabilities Act . . . This will be the only notice of dismissal
      and of your right to sue that we will send you. You may file a lawsuit against the
      respondent(s) under federal law based on this charge in federal or state court. Your

5(f)(1), 12117(a).  Based on mandated legal presumption, Defendants contend that Dr. Anderson

filed her Amended Complaint one day late, depriving this Court of its ability to hear the case.[19]

This argument has legs.

Courts in the Fourth Circuit strictly construe the 90-day time limit in which a plaintiff

must file suit following receipt of a right-to-sue letter.  *Lewis v. Norfolk Southern Corp.*, 271

F. Supp. 2d 807, 811 (E.D. Va. 2013) (ADEA) (citing *Harvey v. City of New Bern Police Dep't*,

813 F.2d 652 (4th Cir. 1987) (Title VII); *Boyce v. Fleet Finance Inc.*, 802 F. Supp. 1404 (E.D.

Va. 1992) (Title VII).  The time limit begins when either the plaintiff or the plaintiff's attorney

receives the right-to-sue letter.  *Irwin v. Dep't of Veteran's Affairs*, 498 U.S. 89, 93 (1990).

---

lawsuit **must be filed WITHIN 90 DAYS from your receipt of this Notice**; or
your right to sue based on this charge will be lost.

*Id.* (emphasis in original).
Here, the Right-to-Sue Letter indicates that the EEOC closed its file based on the
determination that per its "investigation, the EEOC is unable to conclude that the information
obtained establishes violations of the statutes.  This does not certify that the respondent is in
compliance with the statutes."  (Reply Second Mot. Dismiss, Ex. 1.)

[19] The Supreme Court of the United States has held that the "timely charge of
discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a
requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable
tolling." *Zipes v. Trans World Airlines, Inc. Indep. Fed'n of Flight Attendants*, 455 U.S. 385,
393 (1982) (addressing Title VII claim).
Courts have interpreted *Zipes* to apply to the requirement that a plaintiff timely file suit in
district court following receipt of a right-to-sue letter from the EEOC.  *See, e.g., Scott v.
Hampton City Sch. Bd.*, No. 4:14cv128, 2015 WL 1917012, at *1 (E.D. Va. Apr. 27, 2015)
(addressing motion to dismiss ADA and Title VII claims).  For this reason, the Court will
construe the Motion to Dismiss under the appropriate Rule 12(b)(6) standard.  *See id.* at *2 n.1
(explaining that when deciding a motion to dismiss alleging that the plaintiff failed to timely file
suit after receiving a right-to-sue letter from the EEOC, the court must construe the motion to
dismiss under the Rule 12(b)(6) standard as opposed to the Rule 12(b)(1) standard); *c.f. Staudner
v. Robinson Aviation, Inc.*, 910 F.3d 141, 147 (4th Cir. 2018) (finding that the requirement that a
plaintiff exhaust her or his administrative remedies prior to bringing suit pursuant to 29 U.S.C.
§ 185(a) does not affect the district court's jurisdiction to hear the suit).  Accordingly, the Court
will evaluate the Motion to Dismiss under Rule 12(b)(6) and its concomitant standard of review.
*See Scott*, 2015 WL 1917012, at *1.

"When the date that a potential plaintiff received actual notice of right to sue is disputed or unknown, [Federal Rule of Civil Procedure] 6(e)[20] creates the presumption that notice was received three days after it was mailed." *Panyanouvong v. Vienna Wolftrap Hotel*, 525 F. Supp. 2d 793, 796–97 (E.D. Va. 2007) (ADEA motion to dismiss) (citing *Nguyen v. Inova Alexandria Hosp.*, No. 98cv2215, 1999 WL 556446, at *3 (4th Cir. July 30, 1999)). A plaintiff may rebut this presumption with contrary evidence. *Scott*, 2015 WL 1917012 at *3 (citing *Nguyen*, 1999 WL 556446 at *3).

If the Court finds that the plaintiff filed his or her complaint more than 90 days after receipt of the right-to-sue letter, the Fourth Circuit has adopted a flexible rule which allows a court to then determine whether equitable tolling applies. *See Harvey*, 813 F.2d at 654. Courts in the Fourth Circuit engage in a "case-by-case examination to determine if an equitable tolling of the filing period is appropriate." *Nguyen*, 1999 WL 556446, at *3 (internal citations and quotations omitted). The doctrine of equitable tolling is to be employed "sparingly." *Irwin*, 498 U.S. at 96. "Equitable tolling has long been considered an extraordinary remedy in this circuit, and litigants face a considerable burden to demonstrate that it applies." *Hazlegrove v. Colonial Pipeline Co.*, No. 3:18cv284, 2018 WL 6683030, at *4 (E.D. Va. Dec. 19, 2018) (citing *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 476 (4th Cir. 2015)).[21] For equitable tolling

---

[20] The current version of the three-day presumption can be found in Federal Rule of Civil Procedure 6(d), *see Scott*, 2015 WL 1917012 at *3 n.3, which states that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C)(mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)," Fed. R. Civ. P. 6(d).

[21] Equitable tolling is generally "'reserved for those rare instances where—due to circumstances external to a party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'" *Lake v. Capital One Bank, N.A.*, No. 1:11cv1342, 2012 WL 12973539, at *2 (E.D. Va. June 28, 2012) (quoting *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc)).

to apply, the plaintiff must show: "(1) extraordinary circumstances, (2) beyond [her or] his control or external to [her or] his own conduct, (3) that prevented [her or] him from filing on time." *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004) (quoting *Rouse*, 339 F.3d at 246). The Supreme Court has cautioned against the expanded use of the equitable tolling doctrine, stating that "[i]n the long run, experience teaches that adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (internal citation and quotation omitted).

Dr. Anderson asserts that she "kept a record of the date she received the Right to Sue Letter." (Am. Compl ¶ 8.) But Defendants protest that the "actual receipt" date is not controlling. Currently, no record exists as to whether or not equitable tolling would apply. The Court will deny Defendant's Motion to Dismiss based on the Statute of Limitations. The Court will allow sixty (60) days of limited and expedited discovery regarding delivery and receipt of the Right-to-Sue Letter, so it can examine this case to determine whether or not equitable tolling pertains.[22] Defendants' contention that the present lawsuit is time-barred will be determined thereafter.

The Court now turns to Dr. Anderson's federal claims. Anderson brings three counts pursuant to federal law against all Defendants. In Count I, Anderson alleges four violations of the ADA. In Count II, Anderson asserts a hostile work environment claim under the ADA. And in Count III, Anderson alleges several violations of the FMLA. For the reasons that follow, the Court will deny the Motion to Dismiss as to Anderson's first claim in Count I—failure to provide reasonable accommodation under the ADA. This claim will survive against the School Board

---

[22] The Court will issue an Amended Order to set a subsequent briefing schedule.

only. The Court will grant the Motion to Dismiss as to Anderson's other claims against all

Defendants in Count I. The Court will also grant the Motion to Dismiss Counts II and III.

### B.   Count I:  Reasonable Accommodation, Disparate Treatment, Retaliation, and § 1983 Under the ADA

In Count I, Anderson asserts four claims for relief against the Defendants. First,

Anderson alleges that Defendants denied her reasonable accommodations in violation of ADA

§§ 12112(a).[23]  (Am. Compl. ¶ 29.)  Second, she submits that Defendants subjected her to

disparate treatment in violation of the ADA.  (*Id.* ¶ 30.)  Third, Anderson alleges that Defendants

subjected her to retaliation in violation of ADA §§ 12203(a–b).[24]  (*Id.*)  Finally, Anderson

advances a claim under 42 U.S.C. § 1983 for violations of the ADA.  (*Id.* ¶ 32.)

---

[23] Section 12112(a) of the ADA states that

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

[24] Section 12203(a–b) of the ADA states that

> (a) Retaliation

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> (b) Interference, coercion, or intimidation

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(a–b)

For the reasons below, the Court will deny the Motion to Dismiss as to Anderson's first claim in Count I: failure to provide reasonable accommodation under the ADA. This claim will survive against the School Board only. The Court will grant the Motion to Dismiss as to all other claims in Count I against all Defendants.[25]

The Court first determines that Dr. Anderson may not bring her ADA claims against Dr. McMahon and Ciemniecki as individuals. The Court will then consider each of the ADA claims against the School Board.

**1.    Anderson May Bring Her ADA Claims Only Against the School Board and Not McMahon or Ciemniecki**

At the outset, the Court observes that Dr. Anderson cannot bring her ADA claims against Dr. McMahon and Ciemniecki because they are individuals and not "covered entities" as that term is defined under the ADA. 42 U.S.C. § 12112(a).

The ADA commands that "no covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA defines a covered entity as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). Under a plain reading of the statute, neither Dr. McMahon

---

[25] Without explanation, Anderson argues in Count I that the Defendants engaged in "discrimination in violation of §§ 2000e-2, 2000e-3"— sections of Title VII. But Title VII does not apply to disability claims. *See Hockaday v. Brownlee*, 370 F. Supp. 2d 416, 421 (E.D. Va. 2004), *aff'd*, 119 F. App'x 567 (4th Cir. 2005) ("Two federal statutes provide a cause of action for disability discrimination: the Americans with Disabilities Act of 1990 . . . and the Rehabilitation Act of 1973.") "The ADA adopts the 'powers, remedies, and procedures' of Title VII of the Civil Rights Act . . . as its own." *Id.*

While it invokes the ADA, the Amended Complaint does not allege that any of the Defendants discriminated against Anderson because of her "race, color, religion, sex, or national origin" as required to state a claim under Title VII. 42 U.S.C. § 2000e-2(a)(1). Therefore, to the extent Anderson asserts any claims under Title VII, the Court dismisses them here.

23

nor Ciemniecki are (nor does Anderson allege them to be) "an employer, employment agency, labor organization, or joint labor-management committee." *Id.*

Applying this rationale, and noting the similarities between the ADA and Title VII's enforcement schemes, the Fourth Circuit has previously held that "the ADA does not permit an action against individual defendants for retaliation for conduct protected by the ADA." *Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999). Other courts in the Eastern District of Virginia have also determined that individuals are not covered entities under the plain language of the ADA. *See Allen v. Coll. of William & Mary*, 245 F. Supp. 2d 777, 786 (E.D. Va. 2003) (granting motion to dismiss ADA claim because "individuals are not liable for violations of the ADA"); *Stephens v. Kay Mgmt. Co.*, 907 F. Supp. 169, 172–74 (E.D. Va. 1995) (Title VII, ADA, and ADEA case in which court noted that the definition of "employer" in the ADA mirrors that in Title VII when concluding that the ADA defines "employer [as] an employing entity, not an individual" and holding that "individuals who do not independently meet the ADA's definition of 'employer' cannot be held liable under the ADA" when making an employment decision of plainly delegable character).[26] The Court concludes that Dr. Anderson cannot bring claims against Dr. McMahon or Ciemniecki under the ADA.

Because "individuals are not liable for violations of the ADA," the Court will dismiss the ADA claims against Dr. McMahon and Ciemniecki in Count I for failure to state a claim under

---

[26] Several courts of appeals agree that individuals are not covered entities under the plain language of the ADA. *See Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996) (observing as to individual liability that there is "no sound reason to read the Disabilities Act differently from this Court's reading of Title VII and the Age Discrimination Act"); *EEOC v. AIC Sec. Investigations LTD.*, 55 F.3d 1276, 1279–82, 1280 (7th Cir. 1995) (noting that "[c]ourts routinely apply arguments regarding individual liability [under the ADA, ADEA, and Title VII] interchangeably.")

Rule 12(b)(6).[27] *Allen*, 245 F. Supp. 2d at 786. The Court now proceeds to the four claims Anderson brings under Count I, considering those claims solely against the School Board.

### 2.    Count I(a):  Reasonable Accommodation Under the ADA

At this procedural stage, Anderson has alleged sufficient facts to articulate a *prima facie* case for failure to accommodate against the School Board. The Court will therefore deny the Motion to Dismiss Anderson's reasonable accommodation claim against the School Board under the ADA.

### a.    Legal Standard:  ADA Reasonable Accommodation Claims

To establish a *prima facie* case for failure to accommodate under the ADA, a plaintiff must show "(1) that [he] [or she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [his] [or her] disability; (3) that with reasonable accommodation [he] [or she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Jacobs v. N. C. Admin. Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015) (citation omitted); *Watson v. Fairfax Cty., Va.*, 297 F. Supp. 3d 591, 606 (E.D. Va. 2018) (evaluating a reasonable accommodation claim) (citations omitted). An accommodation is considered reasonable "unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). The ADA defines undue hardship as "an action requiring significant difficulty or expense" when considered in light of several factors.[28] 42 U.S.C. § 12111(10)(A–B).

---

[27] As will be conveyed in detail later, the Court will dismiss the ADA claims for hostile work environment and violations of 42 U.S.C. § 1983 against McMahon and Ciemniecki in Count II for the same reason.

[28] Factors to be considered in determining whether an accommodation would impose an undue hardship include:

Two prongs of this test require deeper evaluation here. As to the first factor—whether the plaintiff "was an individual who had a disability"—§ 12102(1)(A) of the ADA defines a disability as "a physical or mental impairment that substantially limits one of more major life activities of such individual" or a "record of such impairment."[29]  42 U.S.C. § 12102(1)(A–B). According to the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).  The definition of major life activity "also includes the operation of a major bodily function, including but not limited to, functions of the immune system . . . neurological, brain, [and] respiratory . . . functions."  42 U.S.C. § 12102(2)(B).

As to the third factor—whether the plaintiff could perform her job "with reasonable accommodation"—the employee must show that she was a "qualified individual" and "could

---

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and,

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(B)(i–iv).

[29] The ADA also allows a claim for "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(C).  Anderson does not allege a so-called "regarded as" claim.

perform the essential functions of the job, or if not, whether any reasonable accommodation by his [or her] employer would enable him [or her] to perform those functions." *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 56 (4th Cir. 2002) (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994)) (internal citations omitted).  The Fourth Circuit has held that maintaining a "regular and reliable level of attendance is an essential function of one's job." *Qualex*, 33 F. App'x 49 at 56 (quoting *Halperin v. Abacus Tech Corp.*, 128 F.3d 191, 199 (4th Cir. 1997)); *see also Watson*, 297 F. Supp. 3d at 600–01 (finding that employee was not a qualified individual under the ADA because frequent absences rendered the employee unable to perform essential job functions).  The term "reasonable accommodation" under the ADA may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and,
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Specifically, "the purpose of reasonable accommodation is to allow a disabled employee to perform the essential functions of his [or her] job." *Harmer v. Va. Elec.*, 831 F. Supp. 1300, 1306 (E.D. Va. 1993).  However, an employer "is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation." *Crawford v. Union Carbide Corp.*, 202 F.3d 257, 261 (4th Cir. 1999) (unpublished per curiam) (internal citations omitted).  An accommodation is considered reasonable "unless [the employer] can demonstrate that the accommodation would impose an undue hardship," 42 U.S.C. § 12112(b)(5)(A), which, as earlier noted, is "an action requiring

27

significant difficulty or expense" when considered in light of several factors, 42 U.S.C.

§ 12111(10)(A–B).

> **b.    The Court Will Deny the Motion to Dismiss Count I Against the School Board for the Failure to Accommodate Claim Because Anderson Has Alleged Sufficient Facts to State an ADA Failure to Accommodate Claim**

The Court will deny the Motion to Dismiss Anderson's ADA reasonable accommodation

claim against the School Board.  To state a claim for failure to accommodate under the ADA,

Anderson must show that: "(1) that [she] was an individual who had a disability within the

meaning of the statute; (2) that the [School Board] had notice of [her] disability; (3) that with

reasonable accommodation [she] could perform the essential functions of the position . . . ; and

(4) that the [School Board] refused to make such accommodations." *Jacobs*, 780 F.3d at 579;

*Watson*, 297 F. Supp. 3d at 606 (citations omitted).  Anderson has plausibly pled a *prima facie*

case of failure to accommodate against the School Board.

As to the first factor, whether Anderson "was an individual who had a disability," taking

the well-pleaded factual allegations in the Amended Complaint as true, Anderson "had a

disability" as defined by the ADA.  *Jacobs*, 780 F.3d at 579.  Section 12102(1)(A) of the ADA

defines a disability as "a physical or mental impairment that substantially limits one of more

major life activities of such individual." 42 U.S.C. § 12102(1)(A).  The definition of major life

activity "includes the operation of a major bodily function, including but not limited to, functions

of the immune system . . . neurological, brain, [and] respiratory . . . functions." 42 U.S.C.

§ 12102(2)(B).  Dr. Anderson suffers from sensitivities and allergies to scents, which causes her

to "experience severe physical and emotional distress." (Am. Compl ¶ 10.)  Her symptoms

include pain in the throat and mouth, difficulty breathing, coughing, cognitive dysfunction,

diarrhea, blurry vision, and migraines, among others. (*Id.* ¶ 20.)  Such symptoms, if shown to

occur upon exposure to scents, constitute a "physical or mental impairment" that limits the function of Anderson's "immune system . . . neurological, brain, [and] respiratory . . . functions." 42 U.S.C. §§ 12102(1)(A); 12102(2)(B). Therefore, Dr. Anderson meets the first *prima facie* factor of the ADA failure to accommodate test.

As to the second factor, whether the employer had "notice of [her] disability," Dr. Anderson includes ample factual allegations that the School Board had the requisite notice. *Jacobs*, 780 F.3d at 579. Specifically, Anderson alleges that until the 2017–18 school year, the School Board "adopted and enforced a scent-sensitivity policy in . . . Anderson's classroom" to accommodate her disability. (Am. Compl. ¶ 11.) Prior to the 2017–2018 school year, Dr. Anderson emailed Dr. McMahon a note, which Anderson intended to then send out to parents of her pupils, detailing her disability and the negative effects that certain scents could have on her bodily functions. (*Id.* ¶ 15.) Anderson provided medical documentation regarding her condition and needed accommodations.[30] (*Id.* ¶¶ 16, 26.) In addition to her 2017 communication with McMahon, Anderson outlines a series of communications with School Board officials regarding how her severely restricting allergies could be allayed. (*Id.* ¶ 17.) Accordingly, Anderson satisfies the second *prima facie* factor of the ADA failure to accommodate test.

As to the third factor, whether reasonable accommodations could allow Dr. Anderson to perform "the essential functions of the position," Anderson plausibly pleads facts sufficient to satisfy this factor. *Jacobs*, 780 F.3d at 579. Anderson reports that for more than a decade the

---

[30] Dr. Anderson provided a number of letters from healthcare providers detailing her sensitivity to certain scents to the School Board. (Am. Compl. ¶ 16.) Although not strictly necessary to a finding that the School Board had notice of Anderson's disability, these letters could constitute a "record of such impairment" under the ADA, showing both that she was a qualified individual under the ADA and that the School Board had notice of her disability. 42 U.S.C. § 12102(1)(B).

School Board "accommodated" her disability through the Scent Policy. (Am. Compl. ¶ 11.)
Pursuant to that Scent Policy, Anderson "was permitted to inform students about her
sensitivity/allergy at the beginning of each school year" and "interacted with parents in the event
of a violation of the policy by a student." (*Id.*) In the years the Scent Policy was in force,
Anderson states that she enjoyed "the full support of the School Board" and "excelled" in her
position. (*Id.* ¶¶ 12–13.) While courts have concluded that excessive absences can cause an
employee to become unqualified under the ADA, a reasonable inference from the allegations in
the Amended Complaint is that Anderson was *not* excessively absent when accommodated prior
to the challenged Page Administration. Drawing all reasonable inferences in favor of Anderson,
she has shown "that with reasonable accommodation [she] could perform the essential functions
of the position." *Jacobs*, 780 F.3d at 579. Thus, Anderson fulfills the third prong of the failure
to accommodate test.

The School Board's contentions otherwise about reasonable accommodation do not
persuade. The School Board argues that Anderson does not satisfy the third factor because the
"scent-free environment that [Anderson] demands . . . is not a reasonable accommodation" as a
matter of law. (Mem. Supp. Second Mot. Dismiss 8, ECF No. 12.) Defendants cite cases that
they say conclude, as a matter of law, that the ADA does not require a scent-free environment as
a reasonable accommodation, but the cases cited fall outside the Fourth Circuit and rest on a
more developed record. *See, e.g., Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir.
1999) (finding that, given excessive absences and request for irritant-free work environment,
district court erred in submitting question of whether employee was a qualified individual to the
jury); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998) (affirming summary
judgment for employer while noting that employee's vague request for allergen-free workplace

did not exist within the company). Even presuming Dr. Anderson sought a fully scent-free environment, the School Board raises this argument prematurely. Whether an accommodation is reasonable or unreasonable depends on whether the School Board "can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).

The Court cannot yet determine whether the accommodation Anderson sought would impose an "undue hardship" on the School Board. 42 U.S.C. § 12112(b)(5)(A). The record does not include essential evidence such as "the overall financial resources of the facility or facilities involved" or the "type of operation . . . of the covered entity, including the composition, structure, and functions of the workforce." *See* 42 U.S.C. § 12111(10)(B)(i–iv). Because Anderson alleges that the School Board previously provided her reasonable accommodations, and that she "excelled" at her job when the School Board provided her with such accommodations, her claims suffice to show that "with reasonable accommodation [she] could perform the essential functions of the position. " *Jacobs*, 780 F.3d at 579. She therefore meets the third *prima facie* factor of an ADA failure to accommodate claim.

Dr. Anderson also plausibly alleges facts to meet the fourth factor, that the School Board "refused to make such [reasonable] accommodations." *Jacobs*, 780 F.3d at 579. Anderson states that while she was previously allowed to "speak to students and their parents about her trigger scents," she was not permitted to do so during the 2017–18 school year. (Am. Compl. ¶ 20.) McMahon (at least for some time) prevented Anderson from calling home "about disruptive and disrespectful behavior for students once they began purposeful repeated or disruptive use of scents." (Am. Compl., Ex. A, 2.) Similarly, while students previously could be disciplined for violating the Scent Policy, (Am. Compl. ¶ 11), the School Board and its representatives in 2017–18 "refused to require students to not wear known trigger scents, nor . . . allow removal of the

31

student[s]" who did, (*id.* ¶ 20). The School Board also prevented Anderson from moving her "classroom to the commons to allow more air and a less confined space" so as to ease the severity of her allergic reactions. (Am. Compl., Ex. A, 1.) And, while the School Board allowed "[a] teacher with Mast Cell Activation Disorder . . . to remove from the classroom and discipline a student who repeatedly wore a scent that she had told her irritated the teacher's condition," Anderson was not permitted to do so. (*Id.* 2.) Taken together, Anderson has enunciated facts sufficient to show that the School Board "refused to make" reasonable accommodations—the fourth factor of an ADA failure to accommodate claim. *Jacobs*, 780 F.3d at 579.

Drawing all reasonable inferences in favor of Dr. Anderson, the Amended Complaint plausibly states a cognizable claim for failure to accommodate under the ADA against the School Board. The Court will deny the Motion to Dismiss on Count I(a) as to Anderson's ADA claim for failure to accommodate against the School Board.

### 3.     Count I(b):  Disparate Treatment Under the ADA

In contrast to the finding above, the Court will grant the Motion to Dismiss as to Anderson's ADA disparate treatment claim against the School Board for failure to state a claim under Rule 12(b)(6).

#### a.     Legal Standard:  Disparate Treatment Claims Under the ADA

To establish disparate treatment under the ADA, "a plaintiff must prove (1) he [or she] has a 'disability,' (2) he [or she] is a 'qualified individual,' and (3) his [or her] employer took an adverse employment action against him [or her] because of his [or her] disability." *Sturgill v. Norfolk S. Ry. Co.*, 391 F. Supp. 3d 598, 603 (E.D. Va. 2019) (granting motion to dismiss ADA disparate treatment claim for failing to allege an actual disability) (quoting *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997)).

The requirement that the employer take "an adverse employment action seeks to differentiate those harms that work a 'significant' detriment on employees from those that are relatively insubstantial or 'trivial.'" *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). To bring a cognizable claim under the ADA, a plaintiff must allege an adverse employment action which can include a "significant change in employment status, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Davis v. Mabus*, No. 2:12cv467, 2013 WL 12099349, at *4 (E.D. Va. Sept. 26, 2013), *aff'd*, 575 F. App'x 201 (4th Cir. 2014) (internal citations omitted) (granting motion to dismiss ADA disparate treatment claim); *Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (in Title VII sex discrimination claim, suggesting adverse action could include lower pay, demotion, failure to promote, failure to receive a bonus, or receiving significantly different responsibilities as part of a PIP).[31] While the analysis of an adverse action "depends on the particular circumstances of the case," an adverse action must be material. *Anne Arundel Cty. Pub. Sch.*, 789 F.3d at 431. All adverse action tests "require that there be an adverse employment action, which denotes some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it." *Id.* (citations and quotations omitted). Mere "dislike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment." *Id.*

---

[31] While *Jensen-Graf* considered claims brought under Title VII, adverse employment actions underlying ADA discrimination are analyzed under the Title VII standard. *See Fox v. GMC*, 247 F.3d 169, 176 (4th Cir. 2001) ("Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases.").

> **b.** **Anderson's ADA Disparate Treatment Claim Against the School Board Falters Because She Fails to Allege a Change In Employment Status Sufficient to Rise to the Level of An Adverse Employment Action**

Dr. Anderson's claim of disparate treatment founders because she does not allege a change in employment status such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Davis*, 2013 WL 12099349, at *4. As a result, she does not satisfy the third prong of a *prima facie* ADA disparate treatment claim because the School Board did not take an adverse employment action against her.

Anderson points to a number of instances in which Defendants treated her differently on account of her disability. For instance, Anderson states that she was forbidden from "addressing a particular student about being allergic to something he or she was wearing, [or] from calling parents about repeated use [of scented products]." (Am. Compl. ¶ 19.) Anderson adds that while other teachers were permitted to use the "alternative and flexible classroom space" known as the "commons area" at "their discretion," she was "disallowed from using this space ONLY for my disability." (Am. Compl., Ex. A, 1.) None of these allegations rise to the level of a "significant change in employment status" because these actions did not lead to a reassignment with "significantly different responsibilities" or an employment "decision causing a significant change in benefits"—the third element of an ADA disparate treatment claim. *Davis*, 2013 WL 12099349, at *4.

Dr. Anderson relies on other portions of her Amended Complaint to support her contention that Defendants subjected her to an adverse employment action. (*See* Resp. Second Mot. Dismiss 15, ECF No. 13.) Specifically, she claims that Defendants placed her on a "pretextual" performance improvement plan by school officials. (*Id.* (citing Am. Compl. ¶¶ 27,

34

36, 41, 59).) But being placed on a performance improvement plan, without a significant change in benefits, does not constitute an "adverse employment action." As the Fourth Circuit has stated,

> [Plaintiff's] complaint fails to state a plausible discrimination claim because she has not alleged any action that could reasonably be considered an adverse employment action. She has failed to allege that she received lower pay, was demoted, was passed over for a promotion, failed to receive a bonus, or given significantly different responsibilities because she was placed on the [performance improvement plan].

*Jensen-Graf*, 616 F. App'x at 598 (4th Cir. 2015); *see also Anne Arundel Cty. Pub. Sch.*, 789 F.3d at 431 ("reprimands and poor performance evaluations occur with some frequency in the workplace"). Dr. Anderson, like the plaintiff in *Jensen-Graf*, does not allege that any negative employment consequence followed the School Board placing her on a performance improvement plan.[32]

Even drawing all reasonable inferences favorably to Anderson, she fails to identify any adverse employment action necessary to plausibly allege an ADA claim for disparate treatment. *Jensen-Graf*, 616 F. App'x at 598. Because such action is a required element of an ADA disparate treatment claim, the Court will grant the Motion to Dismiss the ADA disparate treatment claim against the School Board in Count I(b) for failure to state a claim.

### 4.    Count I(c): Retaliation Under the ADA

The Court will grant the Motion to Dismiss Anderson's ADA retaliation claim against the School Board. Similar to her claim alleging disparate treatment under the ADA, her retaliation

---

[32] In Count 1, Dr. Anderson includes "discharge" as one of many violations of the ADA by the School Board's action. (Am. Compl. ¶ 30.) While Anderson alleges permanent disability, she never describes exactly when or how she stopped teaching at Page Middle School. She makes no mention of having been discharged at all. To the extent the Amended Complaint seeks to raise a retaliatory wrongful discharge claim, Anderson fails to make a *prima facie* case because, among other things, she fails to say she was discharged.

claim falters because she does not plead sufficient facts to state a *prima facie* claim of a materially adverse action under the ADA.

a.    <b><u>Legal Standard:  Retaliation Claims Under the ADA</u></b>

"In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect [allegations] of retaliation, or proceed under a burden-shifting method."[33] *Jacobs*, 780 F.3d at 577 (quoting *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001)); *see also Watson*, 297 F. Supp. 3d at 608. "The elements of an ADA retaliation claim mirror the elements of [a] Title VII retaliation claim." *Jones v. HCA (Hosp. Corp. of Am.)*, 16 F. Supp. 3d 622, 635 (E.D. Va. 2014). To establish a *prima facie* case of ADA retaliation, plaintiffs must show "(1) that they engaged in protected conduct; (2) suffered an adverse action[;] and (3) that a causal link exists between the protected conduct and the adverse action." *Id.* (quoting *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011)).

If a plaintiff succeeds on this first part of his or her claim, the law requires the "plaintiff to establish that any legitimate, non-retaliatory reason offered by the defendant" is pretext for unlawful retaliation. *Watson*, 297 F. Supp. 3d at 608 (citing *Jacobs*, 780 F.3d at 576). "Given that the ADA's anti-retaliation provision is identical to Title VII's, the standard laid out by the Supreme Court for purposes of Title VII controls in this ADA case." *A Soc'y Without a Name*, 655 F.3d at 352. At the Motion to Dismiss stage, a "plaintiff need not plead facts that constitute a *prima facie* case, [but] a plaintiff still bears the burden of alleging facts sufficient to state all the elements of her claim." *Turner v. Richmond Pub. Schools*, No. 3:16cv256, 2017 WL

---

[33] Anderson does not state whether she brings "direct" or "indirect" allegations of discrimination under the ADA. Regardless of whether Anderson has alleged direct or indirect evidence of discrimination, because Anderson does not plausibly allege that the School Board took any materially adverse action against her sufficient to satisfy the elements of a claim under the ADA, the Court will dismiss the claim.

36

1179162, at *12 (E.D. Va. Mar. 28, 2017) (internal quotation marks and citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (stating that a plaintiff seeking to raise an employment discrimination claim "need not plead facts sufficient to establish a *prima facie* case of race-based discrimination to survive a motion to dismiss, but . . . the more stringent pleading standard established in *Iqbal* and *Twombly* applies.").

As the Fourth Circuit has recently observed, the "scope of Title VII's anti-retaliation provision, § 2000e-3, is broader than the anti-discrimination provision." *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). Namely, "the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his [or her] employment or by causing him [or her] harm *outside* the workplace." *Id.* (quoting *Burlington*, 548 U.S. at 63, 67). Nonetheless, retaliatory actions must prove "materially adverse—such that they might have dissuaded a reasonable worker from engaging in protected activity." *Id.* (internal citations omitted).

In determining whether an action is materially adverse, courts should "look at the particular circumstances of the alleged act of retaliation." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 186 (4th Cir. 2019) (quoting *Burlington*, 548 U.S. at 69). Importantly, "[c]ontext matters." *Burlington*, 548 U.S. at 69. "In many cases—perhaps the overwhelming majority of cases—the distinction between 'adverse employment action' and 'materially adverse action' is unlikely to change the outcome of a case." *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 830 (E.D. Va. 2016).

For instance, courts in the Eastern District of Virginia have observed that "reprimands, without collateral consequences, are not 'materially adverse.'" *Id.* at 832 (collecting cases).

Similarly, the following do not constitute materially adverse actions: "failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, an Attendance Warning . . . a formal letter of reprimand, or a proposed termination." *Id.* (collecting cases) (internal citations omitted); *see also Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011). While failing to respond to an employee's phone calls or assigning the employee to difficult work would not ordinarily rise to the level of a materially adverse employment action, denying a pregnant employee the opportunity to work from home after she testified in favor of another employee's discrimination claim might be. *Brockman v. Snow*, 217 F. App'x 201, 207 (4th Cir. 2007). And one court in the Eastern District of Virginia has determined that a university prohibiting an employee from taking classes at the school where employed, thus causing the employee to suffer harm outside the workplace, rose to the level of an adverse employment action. *See Hinton*, 185 F. Supp. 3d at 834–35.

> **b.     Because the Amended Complaint Does Not Plausibly Plead Any "Materially Adverse" Act of Retaliation Taken Against Anderson, the Court Will Grant the Motion to Dismiss as to the ADA Retaliation Claim**

Anderson alleges "that the School Board and McMahon retaliated against Dr. Anderson for complaining about McMahon's actions and asserting her rights under the ADA." (Am. Compl. ¶ 25; Resp. Second Mot. Dismiss 16.) In support of her claim of retaliation, Dr. Anderson states that Dr. McMahon issued a number of "false and defamatory statements" and "put letters of reprimand in Anderson's file for . . . [Anderson] contacting the [school resource officer] and other trivial matters, such as having a bag of herbal supplements." (Am. Compl. ¶ 25; Resp. Second Mot. Dismiss 16.) Anderson also asserts that the School Board and

McMahon "retaliated against . . . Anderson" by placing her "on a pretextual performance improvement plan."[34]   (Am. Compl. ¶ 27.)

     Even taking the factual allegations in the Amended Complaint as true, the actions taken by the Defendants against Anderson do not rise to the level of a "materially adverse" action. *Strothers*, 895 F.3d at 327.  First, Anderson states that McMahon retaliated against her by issuing a poor performance review which stated that she had "deficits in Standard 2, Standard 3, Standard 5 and Standard 6."  (Am. Compl. ¶ 59.)  But in the Fourth Circuit, poor performance reviews are not considered to be "materially adverse" actions. *Hinton*, 185 F. Supp. 3d at 832 (citing *Parsons v. Wynne*, 221 F. App'x 197, 198 (4th Cir. 2007)); *see also Hamilton v. Prince George's Cty.*, No. 17cv2300, 2019 WL 4735429, at *5 (D. Md. Sept. 27, 2019) ("[a] poor performance review or reprimand does not constitute an adverse action unless it causes 'real harm to [the plaintiff's] employment or is an intermediate step to discharge'") (internal citations omitted).

---

[34] Notably, Dr. Anderson does not include in her list of retaliatory actions any mention of the School Board's denial of her requested accommodation. (*See* Am. Compl. ¶¶ 25, 26; Resp. Second Mot. Dismiss 16–17.)  Because Anderson asserts that the School Board retaliated against her for complaining about McMahon, she would not be able to meet the third prong of a *prima facie* test and show that "a causal link exists between the protected conduct and the adverse action." *Jones*, 16 F. Supp. 3d at 635.  Even drawing all reasonable inferences in Anderson's favor, because the denial of accommodation predated her complaints about McMahon, Anderson would be unable to show that the School Board retaliated against her by denying her requested accommodations.  The School Board had already acted at the time Anderson made any complaint.

    More fundamentally, while the denial of a request for accommodation can serve as an act of retaliation against an employee, a plaintiff asserting retaliation must allege a "protected activity" other than the request for accommodation under the ADA. *Id.*  Otherwise, litigants might entirely conflate an ADA discrimination claim with an ADA retaliation claim, and the denial of any requested accommodation would serve as the basis for a *prima facie* retaliation case, eliminating the separate standards for each claim.  And, as identified in footnote 31, Anderson fails to allege wrongful discharge.

Second, placing Anderson on a performance improvement plan, in and of itself, did not constitute a materially adverse action. (*See* Am. Compl. ¶¶ 27, 36, 59.) "A negative performance review or a performance improvement plan alone will not constitute materially adverse action." *Michael v. Va. Commonwealth Univ.*, No. 3:18cv125, 2019 WL 128236, at *4 (E.D. Va. Jan. 8, 2019) (citing *Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va. 2017)); *see also Jensen-Graf*, 616 F. App'x at 598 ("[a] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment" (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004))). While "[a] poor review or performance plan . . . can support an adverse action claim if the employer relies upon it to later take additional action, such as discharging or demoting the employee," *Michael*, 2019 WL 128236, at *4, Anderson does not claim that the School Board discharged or demoted her, or that the School Board has used the performance improvement plan against Anderson in any way.

Third, Dr. Anderson also asserts that Dr. McMahon "put letters of reprimand in Dr. Anderson's file for, *inter alia*, contacting the [school resource officer] and other trivial matters, such as having a bag of herbal supplements to help with her allergic reactions." (Am. Compl. ¶ 25.) But reprimands, such as the type that Anderson claims she experienced here, "without collateral consequences, are not 'materially adverse.'" *Hinton*, 185 F. Supp. 3d at 832 (finding as to a Title VII claim that a reprimand without collateral consequences requires dismissal under the materially adverse action standard). None of those statements caused any "detriment— employment-related or otherwise—besides [what courts have described as] the bruised feelings which 'all employees experience' on occasion." *Id.* Anderson does not allege that she was fired, reassigned different duties, or that she experienced collateral consequences from these

reprimands that rise to the level of materiality. *See Jensen-Graf*, 616 F. App'x at 598 (analyzing adverse employment action standard). While McMahon's allegedly defamatory statements and reprimands may have caused Anderson to feel discomfort, this Court cannot find, even at this procedural posture, that they rise to a "materially adverse" action that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68.

Because Dr. Anderson fails to allege that the School Board undertook any action "that would have been materially adverse to a reasonable employee," she has failed to state a *prima facie* claim for retaliation under the ADA. *Burlington*, 548 U.S. at 54; *Jones*, 16 F. Supp. 3d at 634. The Court will grant the Motion to Dismiss the ADA retaliation claim against the School Board in Count I(c).

### 5.      Count I(d):  Section § 1983 and the ADA

Finally, in Count I, Dr. Anderson alleges that the Defendants' actions subjected her "to the deprivation of rights and privileges secured by the ADA in violation of 42 U.S.C. § 1983." (Am. Compl. ¶ 32.) Because Anderson may not bring an ADA claim through § 1983, the Court will grant the Motion to Dismiss on this cause of action.

First, Courts have long held that § 1983 claims against an individual in his or her official capacity is essentially "a claim against the [government agency] and thus should be dismissed as duplicative." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004). As to any official capacity claim, Dr. McMahon and Ciemniecki are not covered entities under the ADA. *See Baird*, 192 F.3d at 472 ("the ADA does not permit an action against individual defendants for retaliation for conduct protected by the ADA"); *Allen*, 245 F. Supp. 2d at 786 ("individuals are not liable for violations of the ADA"); *see supra* § III(B)(1).

The prohibition against an ADA individual capacity claim arises because Congress created a comprehensive remedial in the ADA which suggests that recourse to § 1983 would be improperly duplicative. This Court finds compelling the majority view that a § 1983 cause of action cannot go forward alongside an ADA action.  While the Fourth Circuit has not spoken on the viability of an ADA claim under § 1983,[35] "every circuit to consider this exact question has held that . . . ADA statutory rights cannot be vindicated through § 1983." *See, e.g., Williams v. Pa. Human Relations Comm'n*, 870 F.3d 294, 300 (3d Cir. 2017).  Noting that § 1983 is not a source of substantive rights but instead provides a method for conferring federal rights, these courts have found that in the ADA, Congress created a "comprehensive enforcement scheme . . . incompatible with individual enforcement under § 1983." *Id.* at 297–98.  As stated by the *Williams* court, "Congress's intent is clear[:] [a]llowing pure Title VII and ADA claims under § 1983 would thwart Congress's carefully crafted administrative scheme by throwing open a back door to the federal courthouse when the front door is purposefully fortified." *Id.* at 299.

*Williams* follows at least four courts of appeals when reaching this conclusion. *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (a plaintiff cannot "maintain a section 1983 action in lieu of—or in addition to—a[n] . . . ADA cause of action if the only alleged deprivation is of

---

[35] The Fourth Circuit has previously found that the "comprehensive remedial framework" of the ADEA bars actions to enforce ADEA rights under § 1983. *Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364, 1368 (4th Cir. 1989).  In that case, the Fourth Circuit found that allowing a plaintiff to assert ADEA rights through the vehicle of a § 1983 claim would allow a plaintiff to bypass "the comprehensive administrative process" of the ADEA and weaken the statute. *Id.* at 1366.  At least one other district court has found *Zombro* to be a "strong indication" as to how Fourth Circuit would view § 1983 claims brought to enforce ADA rights, and determined that the ADA bars a similar action under § 1983. *See Peter B. v. Sanford*, No. 6:10cv767, 2010 WL 5684397, at *5–*6 (D.S.C. Dec. 6, 2010).  Like the *Sanford* court, this Court agrees that *Zombro*'s reasoning applies equally to ADA claims, and the "purposes and structure of the [ADA] are inconsistent with" a duplicative claim under § 1983. *Zombro*, 868 F.2d at 1366.

the employee's rights created by . . . the ADA" (internal citation and quotation omitted)); *Lollar v. Baker*, 196 F.3d 603, 609–10 (5th Cir. 1999) (noting that its comprehensive remedial scheme indicated that "Congress intended to foreclose resort to the more general enforcement provisions of section 1983 to vindicate the rights created by the Rehabilitation Act"); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999) (en banc) (holding that the ADA's "detailed remedial scheme bars [plaintiff] from maintaining a section 1983 action against [defendants] in their individual capacities for alleged violations of the ADA"); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1530–31 (11th Cir. 1997) (finding that allowing suit under the "detailed administrative avenues of redress [in the ADA] as well as section 1983 would be duplicative at best; in effect, such a holding would provide the plaintiff with two bites at precisely the same apple"). No court of appeals has reached a contrary result.

District courts in the Fourth Circuit similarly have concluded that the ADA precludes claims brought under § 1983. *Gatling v. Carter*, No. 15cv3723, 2017 WL 480756, at *6 (D. Md. Feb. 6, 2017) (Rehabilitation Act); *Sanford*, 2010 WL 5684397, at *5–6; *Henderson v. Gilbert*, No. 06cv1284, 2006 WL 1966797, at *1 (D. Md. July 10, 2006) ("[a] plaintiff may not state a claim under 42 U.S.C. §§ 1983 and 1985(3) for rights created by the ADA"). This Court agrees.

Because Dr. Anderson "cannot as a matter of law, pursue these independent causes of action" under the ADA pursuant to § 1983, she fails to state a claim upon which subject matter jurisdiction can lie. *Gatling*, 2017 WL 480756, at *6. The Court will dismiss Anderson's § 1983 ADA retaliation claim against the School Board in Count I pursuant to Rule 12(b)(1).

### C.  Count II:  Hostile Work Environment Under the ADA

Having concluded that Dr. Anderson may proceed in her ADA failure to accommodate claim against the School Board, but dismissing all other claims in Count I, the Court now turns

to Anderson's ADA claims in Count II.  In Count II, Dr. Anderson asserts two claims of relief against all Defendants.  First, she brings a hostile work environment claim pursuant to the ADA.  (Am. Compl. ¶¶ 34–37.)  Second, Anderson charges that the Defendants' actions subjected her to a hostile work environment and deprived her of rights and privileges, secured by the ADA, under § 1983.  (*Id.* ¶ 38.)

For the reasons stated above, Dr. Anderson cannot bring an ADA claim for hostile work environment against either Dr. McMahon or Ciemniecki because they are not "covered entities." *Allen*, 245 F. Supp. 2d at 786 ("individuals are not liable for violations of the ADA"); *see supra* § III(B)(1).  Similarly, Anderson cannot state a claim for violations of the ADA under § 1983. *Gilbert*, WL 1966797, at *1 ("[a] plaintiff may not state a claim under 42 U.S.C. §§ 1983 and 1985(3) for rights created by the ADA"); *see supra* § III(B)(5).  Because Dr. Anderson fails to state a claim for ADA hostile work environment upon which jurisdiction can lie against Dr. McMahon or Ciemniecki, or against any of the Defendants pursuant to § 1983, the Court will dismiss those claims under Rule 12(b)(1).

The Court turns to the sole remaining claim under Count II:  Dr. Anderson's hostile work environment charge against the School Board brought pursuant to the ADA.

### 1.   Legal Standard:  ADA Hostile Work Environment

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To plead a hostile work environment claim under the ADA, a plaintiff must show that:

> (1) he [or she] is a qualified individual with a disability; (2) he [or she] was subjected to unwelcome harassment; (3) the harassment was based on his [or her]

44

disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.

*Mason v. Wyeth, Inc.*, 183 F. App'x 353, 360–61 (4th Cir. 2006) (quoting *Fox*, 247 F.3d at 176–77).

To allege an ADA hostile work environment claim, a plaintiff must show "not only that he [or she] subjectively perceived his [or her] workplace environment as hostile, but also that a reasonable person would so perceive it, *i.e.*, that it was objectively hostile." *Fox*, 247 F.3d at 178; *Wiggins v. DaVita Tidewater, LLC*, 451 F. Supp. 2d 789, 800 (E.D. Va. 2006) (accord). "Factors to be considered with respect to the objective component include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Fox*, 247 F.3d at 178 (internal citations omitted). The work environment must be "hostile or deeply repugnant" and not "merely unpleasant." *Edmonson v. Potter*, 118 F. App'x 726, 730 (4th Cir. 2004) (quoting *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996)).

Importantly, the ADA, like Title VII, does not establish a "general civility code for the American workplace." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal citations omitted) (analyzing Title VII). For that reason, although some workplace conduct may be deeply unpleasant, complaints premised on nothing more than "rude treatment by coworkers . . . callous behavior by one's superiors . . . or a routine difference of opinion and personality conflict with one's supervisor . . . are not actionable." *Id.* at 315–16. (collecting cases) (internal quotations and citations omitted). For a hostile work environment to exist, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *AMTRAK v. Morgan*, 536 U.S. 101, 116 (2002) (citations and quotations omitted) (addressing a Title VII claim). The "'gravamen' of any hostile work environment claim is that the harassment was 'unwelcome.'" *Sunbelt Rentals*, 521 F.3d at 314. And the unwelcome, harassing "conduct must be so extreme as to amount to a change in the terms and conditions of employment." *Id.* at 315.

Hostile work environment claims fundamentally differ from claims for discrete acts of discrimination. "While discrete acts are isolated events, hostile work environment claims involve repeated conduct." *Edwards v. Murphy-Brown, L.L.C.*, 760 F. Supp. 2d 607, 619 (E.D. Va. 2011) (Title VII sex discrimination). As the Supreme Court has stated:

> [h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . [t]he 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

*Morgan*, 536 U.S. at 115.

Therefore, ADA hostile work environment claims must allege a hostile or deeply repugnant work environment, involving repeated instances of unwelcome harassment on the basis of disability (over a series of days or perhaps years) to the degree that the harassment affects the conditions or privileges of employment.

### 2. Anderson Does Not Allege an ADA Hostile Work Environment Claim Because She Does Not Plausibly Plead That the Alleged Harassment She Faced Was Sufficiently Severe or Pervasive

Dr. Anderson does not allege a hostile work environment claim because she does not plead that the harassment she faced was severe or pervasive enough to constitute a hostile work environment. As stated above, Anderson has alleged a reasonable accommodation claim against

the School Board.  Regardless of whether Dr. Anderson ultimately succeeds on that claim, the

School Board's refusal to provide Anderson with certain accommodations, without more, does

not provide the basis for an ADA hostile work environment claim because her allegations fail to

satisfy the fourth element of such a claim.

The Court will first discuss the circumstances and allegations underlying Dr. Anderson's

hostile work environment claim.  Next, the Court will explain why a substantial portion of those

factual allegations do not constitute "harassment" as that term is used in the employment

discrimination context.  Finally, the Court will describe its determination that, even considering

the factual allegations which could support a claim of a hostile work environment as true,

Anderson has not stated a claim for hostile work environment under the ADA because she has

not alleged conduct severe or pervasive enough to constitute a hostile work environment as a

matter of law.

> **a.    Anderson Alleges At Least Nine Events In Support of Her
> Hostile Work Environment Claim**

Dr. Anderson bases her ADA hostile work environment claim on the following nine

events:

> (1)  Refusal to allow access to spaces outside the classroom which "increased [her]
> toxin load too much" and resulted in "a life-altering injury." (Am. Compl., Ex A,
> §§ II–III.)
>
> (2)  Refusal to allow Anderson to discipline students or call home, which
> encouraged students to wear scents that severely compromised Anderson
> physically and psychologically. (*Id.* §§ IV–VI; Am Compl. ¶ 24.)
>
> (3)  Dr. McMahon's refusal to protect Anderson's health "in the face of known
> threats." (Am. Compl. ¶ 22.)
>
> (4)  When informed of students wearing a known allergen, McMahon's
> "mock[ery]" of Anderson by telling her to speak to a student using a scent while
> saying that telling the students about her allergies "would be going against 'direct
> orders.'" (*Id.* ¶ 22.)

(5)   McMahon's refusal to protect Anderson while protecting "others with disabilities and students with allergies to scents" thereby fostering an "abusive work environment where Dr. Anderson was ridiculed and treated unfairly because of her disability." (Am. Compl., Ex. A, §§ VIII–IX.)

(6)   McMahon and Ciemniecki treating Anderson with "open disdain" when saying that "her health 'was not Gloucester's concern'; 'we want you to get over this'; 'you need to figure out how to teach'; and other highly inappropriate, insensitive, and downright discriminatory statements." (Am. Compl. ¶¶ 19, 27, 59.)

(7)   McMahon and Ciemniecki trapping Anderson into a "life-threatening environment" through the cumulative effect of their actions. (*Id.* ¶¶ 19, 20, 28.)

(8)   Creating a work environment that was analogous to causing her to suffocate. (Am. Compl., Ex. C.)

(9) McMahon's defamation against, and reprimand for trivial matters of, Anderson. (Am. Compl. ¶¶ 25, 29.)

(*See* Resp. Second Mot. Dismiss 20–21, ECF No. 13.)[36]  Dr. Anderson asserts that these facts,

read together, form a sufficient basis to state a claim for a hostile work environment under the

ADA. (*See id.* 21.) Even to the extent that the Court can consider the documents improperly

attached to Dr. Anderson's Amended Complaint, the Court determines that these facts, read in

the light most favorable to Anderson, do not establish that Anderson has alleged a *prima face*

case for a hostile work environment under the ADA.

> **b.    A Substantial Portion of Dr. Anderson's Factual Allegations**
> **Do Not Comport with the Plain Meaning of Harassment**

The Court cannot consider a number of Dr. Anderson's proffered statements and

incidents, listed above, because they do not constitute "harassment" under the ADA.  First, the

denial of accommodation alone does not constitute "harassment" under the ADA.  Second, Dr.

---

[36] The Court has altered some of the citations in the response to match the citation style used in the rest of the Memorandum Opinion.

Anderson's list of nine statements and incidents largely offers only legal conclusions or restates, in conclusory fashion, her reasonable accommodation claim.

Dr. Anderson's hostile workplace claim centers on the School Board's refusal to provide her with what she viewed to be reasonable accommodations. (Am. Compl. ¶ 35.) Because of the School Board's decision, Anderson claims she "was forced to accept unreasonable accommodations that made her very sick." (*Id.*)

First, an employer's refusal to provide reasonable accommodations, by itself, does not comport with the plain meaning of harassment under the second element of the hostile work environment test. Dr. Anderson does "not allege any threats, disparaging comments, physical contact, or verbal abuse of any kind, much less harassment based on her . . . disability." *Spida v. BAE Sys. Info. Sols.*, No. 1:16cv979, 2016 WL 7234088, at *7 (E.D. Va. Dec. 13, 2016). Instead, Anderson contends that the School Board's managerial decision to provide ineffective accommodations exposed her to harmful scents that caused her physical illness. But, even given their consequences, "[d]isagreements with management decisions . . . do not rise to the level of a hostile work environment." *Id.* at *6. Therefore, Anderson does not show that she "was subjected to unwelcome harassment" as the term harassment is used in ADA claims. *Mason*, 183 F. App'x at 360.[37]

---

[37] Additionally, the Fourth Circuit has stated that "[t]he 'gravamen' of any hostile work environment claim is that the harassment was 'unwelcome.'" *Sunbelt Rentals*, 521 F.3d at 314 (analyzing religious slurs levied at a Muslim man during his employment). A managerial decision concerning the scope of accommodations to provide to a disabled employee, however, cannot be readily described as "welcome" or "unwelcome" in the same manner as a comment concerning one's disability, race, or gender. *Id.* Rather, it is the second or third order effects of that managerial decision—here, the presence of scents in Dr. Anderson's classroom—that caused her discomfort, not the statements or actions of the School Board or its employees.

Second, much of the Defendants' conduct towards Dr. Anderson, as reflected in her list of supporting incidents and allegations, does not comport with the plain meaning of harassment. Several of the statements offer no more than borderline conclusions which, instead of referencing some affirmative act of harassment on the part of the School Board, refer back to McMahon's and Ciemniecki's alleged refusal to make reasonable accommodations. For instance, Dr. Anderson states that Defendants failed to protect her "in the face of known threats," (Resp. Second Mot. Dismiss 20 (citing Am. Compl. ¶ 22)), trapped Anderson in a "life-threatening environment," (Resp. Second Mot. Dismiss 20 (citing Am. Compl. ¶¶ 19, 20, 28)), informed Anderson that informing students of her allergy would be "would be going against 'direct orders,'" (Am. Compl. ¶ 22), refused to allow her to change classrooms, (Am. Compl., Ex. A), refused to allow her to discipline students for wearing scents, (*id.*), and placed her in an emotional environment where she felt as if she might suffocate, (Am. Compl., Ex. C). But, considering all the circumstances, these decisions, and their effect on Anderson, do not constitute "threats, disparaging comments, physical contact, or verbal abuse of any kind." *Spida*, 2016 WL 7234088 at *7. Rather, they restate, in different conclusory forms, her claim for denial of reasonable accommodations. They are not "threats, disparaging comments, physical contact, or verbal abuse of any kind" on the part of McMahon, Ciemniecki, or any other representative or employee of the School Board. *Id.* So despite her subjective belief that these decisions rose to the level of harassing behavior, they do not objectively rise to the nature, frequency, and severity the law requires.

Other statements are similarly conclusory. Dr. Anderson states that McMahon's refusal to accommodate her while protecting "others with disabilities and students with allergies to scents" fostered an "abusive work environment where Dr. Anderson was ridiculed and treated

50

unfairly because of her disability." (Am. Compl., Ex. A.) Even viewing the factual allegations she submits as true, the Amended Complaint does not specify any incidents to support her subjective factual assertion that she was "ridiculed and treated unfairly." (*Id.*)

In short, of the list provided in Dr. Anderson's Response to the Motion to Dismiss, Items One through Five, Seven, and Eight do not square with the plain meaning of harassment under the ADA. Therefore, the Court will not consider these items when considering Anderson's ADA hostile work environment claim. The Court next turns to her remaining factual allegations—McMahon and Ciemniecki's statements to Anderson (Item Six) and alleged defamation of her (Item Nine)—to consider those allegations alongside her claims of denial of reasonable accommodations under the ADA. The Court finds that, even weighing these assertions together, Anderson does not allege conduct "severe or pervasive" enough to meet the high standard for a hostile work environment under the ADA. *Morgan*, 536 U.S. at 116.

> **c.   Anderson Does Not Meet the Fourth Element of a Hostile Work Environment Claim Because She Has Not Asserted That She Faced Sufficient "Severe or Pervasive" Harassment**

Anderson has not met the fourth prong of a hostile work environment claim because she does not allege that the conduct she faced at work was sufficiently severe or pervasive to alter a term, condition, or privilege of employment.

First, the School Board's denial of reasonable accommodation cannot *alone* suffice to make out a *prima facie* case of a hostile work environment. Because a hostile work environment claim must involve repeated conduct, several courts have determined that "the mere denial of a requested accommodation, with nothing more, will not rise to the level of a hostile work

environment."[38] *Floyd v. Lee*, 85 F. Supp. 3d 482, 517 n.54 (D.D.C. 2015); *Blundell-Zuker v. Oakland Cty. Prob. Court*, 9 F. App'x 318, 319 (6th Cir. 2001) (holding that evidence of two meetings where an employee "was told that she could not be accommodated and then offered [a] transfer" were "insufficient to establish the kind of severe and pervasive mistreatment necessary to state a hostile environment claim"). Therefore, the School Board's denial of reasonable accommodations cannot, as alleged, support a hostile work environment claim because the denial is a discrete act.[39]

---

[38] Also, a discrete act of denying reasonable accommodations does not fit the standard for the necessary severe and pervasive repeated conduct that could establish a hostile work environment. As the Supreme Court has stated "[h]ostile environment claims are different in kind from discrete acts . . . . [a] hostile work environment occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Morgan*, 536 U.S. at 115. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (citing 42 U.S.C. § 2000e—5(e)(1)). Even reading Dr. Anderson's claims favorably, *Morgan* and other courts have concluded that the School Board's decision to deny Anderson reasonable accommodations was a "discrete act." *See, e.g., Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1059 (8th Cir. 2016) ("an employer's denial of a request for a reasonable accommodation . . . is a discrete act of discrimination"). Anderson was, in her words, "forced to accept unreasonable accommodations that made her very sick" early in the school year. (Am. Compl. ¶ 35.) The School Board's decision therefore did not involve "repeated conduct" under the law. *Morgan*, 536 U.S. at 115.

[39] The Court recognizes, as other courts have, that "[t]he prolonged denial of a reasonable accommodation can underlie a hostile work environment claim when 'all the circumstances' would support such a claim." *Floyd*, 85 F. Supp. 3d at 517. "That is, when making a hostile work environment determination, the jury can weigh a wrongful denial of accommodation alongside evidence of other harassment, and that other evidence can augment the weight of the denial by suggesting discriminatory animus." *Id.*; *see also Fox*, 247 F.3d at 179 (finding that forcing an employee to "perform tasks beyond his medical restrictions," considered alongside evidence of consistent verbal harassment targeting his disability, could support a finding of a hostile work environment).

But "the mere denial of a requested accommodation, with nothing more, will not rise to the level of a hostile work environment." *Floyd*, 85 F. Supp. 3d at 517 n. 54. As explained above, even given the length of time of the denial here, Anderson does not plausibly allege significant additional acts or comments, especially directed towards her disability, to raise such a hostile work environment claim.

*Even if* denial of reasonable accommodations could qualify as "harassment" under the meaning of the ADA, Dr. Anderson must support her hostile work environment claim with other instances of harassment or discrimination "sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment."[40] *Morgan*, 536 U.S. at 116. She does not do so here.  To further support her hostile work environment claim, Dr. Anderson states that she "suffered tangible employment action . . . including being out [sic] on a [performance improvement plan]."[41]  (Am. Compl. ¶ 36.)  Being placed on a performance improvement plan, however, does not render a work environment "hostile or deeply repugnant." *Edmonson*, 118 F. App'x at 730.  While unpleasant for Dr. Anderson, the School Board's decision to place her on a performance improvement plan does not amount to "discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Morgan*, 536 U.S. at 116 (internal citations omitted).

Dr. Anderson similarly contends that the School Board, McMahon, and Ciemniecki created a hostile work environment through their statements: "that her health was 'not Gloucester's concern'; 'we want you to get over this'; [and] 'you need to figure out how to teach'; and other highly inappropriate, insensitive and downright discriminatory statements." (Am. Compl. ¶ 27.)  But "callous behavior by one's superiors . . . or a routine difference of opinion and personality conflict with one's supervisor . . . are not actionable." *Sunbelt Rentals,*

---

[40] Otherwise, an ADA denial of reasonable accommodation claim and a hostile work environment claim would effectively merge, resulting in duplicative claims.

[41] Although not included in Dr. Anderson's list in her Response, Anderson asserts that the School Board's placement of her on a performance improvement plan constituted a "tangible employment action" taken against her in support of her hostile work environment claim. (Am. Compl. ¶ 36.)

521 F.3d at 315–16.  While this interaction with her supervisors may have been unpleasant, Anderson does not allege conduct on the part of the School Board "sufficiently severe or pervasive to alter a term, condition, or privilege of employment," especially considering that the School Board approved her leave under the FMLA.  *Mason*, 183 F. App'x at 361 (quoting *Fox*, 247 F.3d at 176–77).

Similarly, Anderson asserts that McMahon and Ciemniecki defamed her.  (*See* Am. Compl. ¶ 59.)  But she again omits how those statements—which, as explained below, do not constitute defamation—constituted harassment "sufficiently severe or pervasive enough to alter a term, condition, or privilege of employment."  *Mason*, 183 F. App'x at 361 (quoting *Fox*, 247 F.3d at 176–77).  Furthermore, most of these statements did not specifically reference Anderson's disability, but her professional performance in the classroom.  And Anderson does not allege that McMahon or Ciemniecki made any of the statements to her, or that she was aware of the statements while she worked at Page.  (Am. Compl. ¶ 59.)  Under *Sunbelt Rentals*, these allegedly defamatory statements could not have been "unwelcome" to Anderson if they were not directed towards her, and she was unaware of their existence during her employment at Page.  521 F.3d at 314.  Finally, even taking these statements as a whole and considering each one, they do not plausibly make out a workplace "permeated with discriminatory intimidation, ridicule, and insult" that Anderson must meet to satisfy the "high bar" of a *prima facie* case of a hostile work environment.  *Id.* at 315.

While Anderson may have subjectively believed the School Board, McMahon and Ciemniecki's comments to her were callous or unfair, she draws no causal link between these comments and her ability to perform her day-to-day job.  Indeed, Anderson makes clear that she

was forced to seek leave from Page, not because of the comments of her superiors, but because her health had deteriorated. (Am. Compl. ¶ 20.)

Dr. Anderson does not state a claim for hostile work environment under the ADA. Many of her supporting factual allegations, including the School Board's denial of her request for accommodations under the ADA, do not comport with the plain meaning of harassment. Those that could conceivably be regarded as harassment do not include the type of intimidation, ridicule, or insult that are "sufficiently severe or pervasive to alter a term, condition, or privilege of employment." *Mason*, 183 F. App'x at 361 (quoting *Fox*, 247 F.3d at 176–77). Recognizing that "[w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard," Anderson has not met the "high bar" for alleging a hostile work environment under the ADA. *Sunbelt Rentals*, 521 F.3d at 315. "Some rolling with the punches is a fact of workplace life." *Id.* The conduct alleged here, while assuredly unpleasant, is not actionable under the high standard for a hostile work environment claim in the Fourth Circuit.

The Court will grant the Motion to Dismiss as to Count II—the ADA hostile work environment claim—under Rule 12(b)(6).

### D.   Count III: Interference and Retaliation Under the FMLA

In Count III, Dr. Anderson brings three separate claims against all Defendants, pursuant to § 2615 of the FMLA.[42] (Am. Compl. ¶ 41.) First, she alleges that the Defendants interfered

---

[42] Congress enacted the FMLA to provide leave for workers whose personal or medical circumstances require that they take time off from work in excess of what their employers are willing or able to provide. "In this legislation, Congress sought 'to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, . . . to promote national interests in preserving family integrity,' and 'to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a

with the exercise of her rights under the FMLA. (*Id.*) Second, she claims that the Defendants retaliated against her for opposing employment practices made unlawful by the FMLA. (*Id.*) Third, she alleges that the Defendants "subjected . . . Anderson to the deprivation of rights and privileges secured by the FMLA in violation of . . . § 1983 and the FMLA." (*Id.* ¶ 42.)

The facts as set forth in the Amended Complaint, even favorably read, do not sufficiently state a claim for interference or retaliation under the FMLA. Furthermore, as with the ADA, Anderson cannot enforce the substantive rights of the FMLA through § 1983. Therefore, the Court will dismiss Count III in its entirety.

### 1.   Count III(a): Interference Under the FMLA

#### a.   Legal Standard: Interference with FMLA Rights

The Fourth Circuit has explained that the FMLA contains prescriptive and proscriptive protections. *Yashenko*, 446 F.3d at 546. Prescriptively, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's FMLA rights. 29 U.S.C. § 2615(a)(1). This gives rise to a so-called FMLA

---

child, spouse, or parent who has a serious health condition.'" *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006) (quoting 29 U.S.C. § 2601(b)(1)-(2)).

Section 29 U.S.C. § 2615(a) states that:

(1) Exercise of rights

 It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).

"interference" or "entitlement" claim. *Yashenko*, 446 F.3d at 546. To state a claim for interference under the FMLA, a plaintiff must "demonstrate that (1) he [or she] is entitled to an FMLA benefit; (2) his [or her] employer interfered with the provision of that benefit; and (3) that interference caused harm."[43] *Anne Arundel Cty. Pub. Sch.*, 789 F.3d at 427.

When the eligible employee returns from leave, he or she must "be restored by the employer to the position of employment held by the employee when the leave commenced," 29 U.S.C. § 2614(a)(1)(A), or "be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment," 29 U.S.C. § 2614(a)(1)(B). As a result, "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Sumner*, 2015 WL 3444885, at *4 (quoting 29 C.F.R. § 825.220(b)). The Fourth Circuit has explained, however, that "the FMLA does not require an employee to be restored to his [or her] prior job after FMLA leave if he [or she] would have been discharged had he [or she] not taken leave." *Yashenko*, 446 F.3d at 547.

### b.   Anderson Fails to State a FMLA Interference Claim Because She Was Not Denied Any Benefits Under the FMLA

Dr. Anderson does not plausibly plead a claim for interference under the FMLA because she has not alleged that any of the Defendants "interfered with the provision" of her FMLA

---

[43] Courts regularly apply a five-part test to determine whether FMLA interference has occurred. That test requires a plaintiff to show that "(1) she was an eligible employee; (2) the defendant was an FMLA-defined employer; (3) plaintiff was entitled to leave under the statute; (4) plaintiff gave notice to the employer that she would take FMLA leave; and (5) the employer denied the plaintiff her FMLA benefits." *Corbett v. Richmond Met. Trans. Auth.*, 203 F. Supp. 3d 699, 709 (E.D. Va. 2016) (evaluating FMLA retaliation claim on a motion to dismiss); *Sumner v. Mary Washington Healthcare Physicians*, No. 3:15cv42, 2015 WL 3444885, at *4 (E.D. Va. May 28, 2015). Were this Court to apply this test, Anderson would fail to state a claim because she was not denied FMLA leave.

benefits or that she suffered "harm" from any interference. *Anne Arundel Cty. Pub. Sch.*, 789 F.3d at 427.

Dr. Anderson does not allege that any of the Defendants prevented her from taking FMLA leave.  To the contrary, Anderson states that she took leave under the FMLA, and specifies no actions taken by any of the Defendants to interfere with her ability to take such leave.  (Am. Compl. ¶ 26.)  She does not allege, nor can she, that the Defendants "den[ied] the exercise of or the attempt to exercise" her FMLA rights.  29 U.S.C. § 2615(a)(1).  Where a plaintiff fails to "allege that she was actually denied any FMLA benefits, [the plaintiff] has failed to allege any prejudice related to FMLA interference." *Downs v. Winchester Med. Ctr.*, 21 F. Supp. 3d 615, 619 (W.D. Va. 2014).  Anderson therefore does not even allege that her employer "interfered with the provision" of an FMLA benefit—the second prong of an FMLA interference claim—because she does not specify which FMLA benefits she failed to receive. *Anne Arundel Cty. Pub. Sch.*, 789 F.3d at 427.  Because the School Board permitted her to take FMLA leave, Anderson does not plausibly plead that any hypothetical interference caused "harm" or prejudice. *Id.*

For that reason, Dr. Anderson's FMLA interference claim cannot survive Rule 12(b)(6) scrutiny, and the Court will dismiss Count III(a) against all Defendants for failure to state a claim.

### 2.   Count III(b):  Retaliation Under the FMLA

#### a.   Legal Standard:  Retaliation Claims under the FMLA

Proscriptively, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by

this subchapter." 29 U.S.C. § 2615(a)(2). This provision allows an employee to bring a FMLA "retaliation" or "discrimination" claim. *Yashenko*, 446 F.3d at 546.

FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). Thus, to allege an FMLA retaliation claim, Anderson must first make a *prima facie* showing "that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to [her] protected activity." *Yashenko*, 446 F.3d at 551.[44] An adverse employment action must negatively affect "the terms, conditions, or benefits of . . . employment." *Csicsmann v. Sallada*, 211 F. App'x 163, 168 (4th Cir. 2006) (quoting *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997)). Furthermore, the plaintiff "must show that a reasonable employee would have found the challenged action to be materially adverse." *Burlington*, 548 U.S. at 68.

If a plaintiff advances sufficient evidence to establish a *prima facie* case of retaliation, the defendant bears the burden of offering a legitimate, non-discriminatory basis for the adverse action. *See Anne Arundel Cty. Pub. Sch.*, 789 F.3d at 429. Should the employer's proffer succeed, the plaintiff then must show that the "reason for taking the adverse employment action was pretextual." *Id.* (citations omitted).

At the motion to dismiss stage, a "plaintiff need not plead facts that constitute a *prima facie* case, [but] a plaintiff still bears the burden of alleging facts sufficient to state all the

---

[44] As stated above, Anderson does not state whether she brings "direct" or "indirect" allegations of discrimination under the FMLA. Regardless of whether Anderson has alleged direct or indirect evidence of discrimination, because Anderson does not plausibly allege that the School Board took any "adverse action against her" sufficient to state a claim under the FMLA, the Court will dismiss the claim. *Yashenko*, 446 F.3d at 550–51.

elements of her claim." *Turner*, 2017 WL 1179162, at *12 (internal quotation marks and citations omitted); *see also Woods*, 855 F.3d at 648 (stating that a plaintiff seeking to raise an employment discrimination claim "need not plead facts sufficient to establish a *prima facie* case of race-based discrimination to survive a motion to dismiss, but. . . the more stringent pleading standard established in *Iqbal* and *Twombly* applies.").

### b.  Anderson Fails to State a FMLA Retaliation Claim Because She Has Not Alleged an Adverse Employment Action

Anderson's FMLA retaliation claim against the Defendants falters because she has failed to allege an adverse employment action that negatively affected "the terms, conditions, or benefits of . . . employment." *Csicsmann*, 211 F. App'x at 168.

Anderson's Amended Complaint does not include any allegation that the Defendants engaged in any employment action that could be considered adverse under the FMLA. In support of both her interference and retaliation claims, Anderson identifies in her Amended Complaint several adverse actions taken against her, including that:

1. "She was removed from the employee mailing list for months;"

2. "Her key to Page was deactivated without notice;"

3. "She was denied access to her student rosters and gradebook;"

4. "Accounts were removed with access to her students' testing data;"

5. "She was ordered to remove her personal belongings;"

6. "She was ordered (via a school secretary on the phone) to turn in her key and computer so that a substitute could have them;" and,

7. "She was refused access to her state testing results of individual students."

(Am. Compl. ¶ 41.)

Dr. Anderson does not plead facts sufficient to categorize these actions as adverse employment actions.[45]  Anderson does not include a time frame surrounding these actions, but appears to indicate that they occurred after she took FMLA leave. (*See* Am. Compl. ¶ 41.) Drawing that reasonable inference in her favor, the Court assumes that these actions occurred after Anderson requested and was granted FMLA leave.

A reasonable employee would not have found these actions to be "materially adverse." *Burlington*, 548 U.S. at 68.  This is true because these administrative actions did not "affect the terms, conditions, or benefits of . . . employment," but rather modified Anderson's access to certain school property and information while she was on FMLA leave. *Csicsmann*, 211 F. App'x at 168.  Dr. Anderson does not allege any reduction in her role, her compensation, or her normal teaching duties while she was not on leave from Page. *See Corbett*, 203 F. Supp. 3d at 710 (granting motion to dismiss retaliation claim because plaintiff "proffered no facts to indicate that her pay, benefits, or working conditions changed in any way upon her return" (citing *Csicsmann*, 211 F. App'x at 166 ("finding no FMLA violation where Plaintiff's salary, title, bonus eligibility, health care, and retirement benefits remained unchanged"))).

More fundamentally, a reasonable employee would not have found these ordinary administrative actions, consistent with preparing for a teacher to go on leave, materially

---

[45] To the extent Dr. Anderson asks the Court to find that these actions support a FMLA interference claim, it will not do so.  Even reading her allegations favorably, these actions are not of a nature that would "discourag[e] an employee from using [FMLA] leave." *See Sumner*, 2015 WL 3444885, at *4 (quoting 29 C.F.R. § 825.220(b)).

adverse.[46] For these reasons, the Court will dismiss Anderson's FMLA retaliation claim in Count III(b) against all Defendants for failure to state a claim under Rule 12(b)(6).

### 3. Count III(c): Section § 1983 and the FMLA

In the Amended Complaint, Anderson claims that the Defendants "subjected [her] to the deprivation of rights and privileges secured by the FMLA in violation of . . . § 1983 and the FMLA." (Am. Compl. ¶ 42.) Because Anderson cannot enforce the substantive rights of the FMLA through § 1983, the Court will grant the Motion to Dismiss this claim.

As with the ADA, the FMLA "precludes resort to § 1983." *See Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 963 (6th Cir. 2013). While the Fourth Circuit has not spoken on this issue in a published opinion, numerous district courts within the Fourth Circuit have observed "the FMLA provides a comprehensive enforcement scheme which forecloses a §1983 claim." *Jolliffe v. Mitchell*, 971 F. Supp. 1039, 1045 (W.D. Va. 1997); *Woods v. S. C. HHS*, No. 3:18cv00834, 2019 U.S. Dist. LEXIS 226897, at *29–*30 (D.S.C. Dec. 19, 2019). Other district courts have noted the near unanimous view that the FMLA precludes any enforcement of its rights through a § 1983 claim. *See Desrochers v. Hilton Hotels Corp.*, 28 F. Supp. 2d 693, 695 (D. Mass. 1998) ("Of the courts that have considered the relationship between Section 1983 and the FMLA, all

---

[46] If Anderson alleged that she had returned from FMLA leave and these actions continued to be taken against her, then those actions could conceivably affect the terms and conditions of her employment. However, no such allegations are in the Amended Complaint.

If on the other hand, these actions occurred *before* Anderson asked for and took FMLA leave, then she likely could not show a "causal link," as required by the third prong of an FMLA retaliation claim, between her engaging in protected activity—taking FMLA leave—and the alleged retaliation. *Yashenko*, 446 F.3d at 550–51.

but one of these courts have held that Section 1983 does not provide an alternative means of enforcing the rights granted by the FMLA.").[47] This Court agrees with the majority position.

The Court finds that the FMLA "precludes resort to § 1983" as a means to enforce its substantive rights. *Diaz*, 703 F.3d at 963. The Court will dismiss, under Rule 12(b)(1), Dr. Anderson's FMLA claims brought under § 1983 in Count III against all Defendants for failure to state a claim on which jurisdiction can lie.

### E.    Conclusion: Anderson's Federal Claims

The Court will deny the Motion to Dismiss as to Dr. Anderson's reasonable accommodation claim against the School Board in Count I.[48] The Court will dismiss the remainder of Counts I, II, and III against all Defendants. The Court now turns to Anderson's state law claims.

### IV. Analysis:  Virginia State Law Claims

Anderson asserts five counts against McMahon and Ciemniecki pursuant to Virginia law. In Count IV, (the "Nuisance Claim"), Anderson alleges that McMahon and Ciemniecki's policy

---

[47] Furthermore, as detailed in the district court's decision in *Woods*, Congress modeled the FMLA on the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and "expressed its intent that the FMLA was to be enforced in accordance with the enforcement scheme of the FLSA." *Woods*, 2019 U.S. Dist. LEXIS 226897, at *28. The Fourth Circuit has previously determined that the FLSA's enforcement scheme "evinced a clear intent to preclude the use of § 1983 for the protection of . . . rights secured by the FLSA." *Id.* (quoting *Kendall v. City of Chesapeake*, 174 F.3d 437, 443 (4th Cir. 1999)). Given the similar enforcement scheme of the FMLA and FLSA, the *Kendall* court's ruling that the FLSA precludes resort to § 1983 would apply with equal force to the FMLA. *See id.*

[48] The Court will also dismiss Dr. Anderson's claim for punitive damages. Under 42 U.S.C. § 1981a(b)(1), government entities, such as the School Board, are exempt from punitive damages under the ADA. *See* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency, or political subdivision) . . . ."). Because the Court has dismissed all of Dr. Anderson's federal claims against McMahon and Ciemniecki, and Anderson's sole surviving claim is brought against a government agency, her request for punitive damages must also be dismissed.

of allowing the physical presence of scents in Anderson's classroom "constitutes a nuisance." (Am. Compl. ¶ 44.) In Count V, (the "Battery Claim"), Anderson claims that McMahon and Ciemniecki caused "unwanted touchings of . . . Anderson by permitting students to wear scents." (*Id.* ¶ 48.) In Count VI, (the "Gross Negligence Claim"), Anderson submits that McMahon and Ciemniecki's actions in exposing her to scents "constitutes a degree of negligence . . . amounting to a complete neglect of the rights, interests, welfare and safety" of Anderson. (*Id.* ¶ 51.) In Count VII, (the "Common Law Conspiracy Claim"), Anderson charges McMahon and Ciemniecki with acting "in concert . . . for the express purpose of injuring . . . Anderson in her professional reputation." (*Id.* ¶ 55.) In Count VIII, (the "Defamation *Per Se* Claim"), Anderson alleges that McMahon and Ciemniecki "made and published to third-parties numerous false factual statements of or concerning . . . Anderson."[49] (*Id.* ¶ 59.)

For the reasons stated below, the Court will grant the Motion to Dismiss all five of the Virginia state law claims against both Dr. McMahon and Ciemniecki for failure to state a claim under Rule 12(b)(6).

## A.     Count IV: The Nuisance Claim

### 1.     Legal Standard: Private and Public Nuisance

Virginia recognizes two types of nuisance: private and public. *307 Campostella, LLC v. Mullane*, 143 F. Supp. 3d 407 (E.D. Va. 2015) (internal citations omitted). Under Virginia law, one commits a private nuisance when using his or her property in a manner that "unreasonably interferes with the use and enjoyment of another's property." *City of Newport News v. Hertzler*, 221 S.E.2d 146, 150 (Va. 1976). "Put another way, a private nuisance implicates a right which is

---

[49] Because Count VII, the Common Law Conspiracy Claim, relies on Count VIII, the Defamation *Per Se* Claim, for its viability, the Court considers those claims in reverse order.

particular to an individual, such as an interest in land." *Moran v. Fed. Nat'l Mortg. Ass'n*, No. 2:12cv212, 2012 WL 2919529, at *3 (E.D. Va. July 17, 2012). One who has no interest in the property affected, such as an employee at a place of employment, cannot maintain an action based on a private nuisance. *See Yoon v. Gilbert Small Arms Range*, 33 Va. Cir. 254 (1994) (holding status as employee on premises, even one with partial ownership interest and responsibility for daily operations, does not confer standing to maintain a private nuisance claim); *see also Hinton v. Kroger*, No. 3:19cv178, 2019 WL 4060339, at *4 (E.D. Va. Aug. 28, 2019) (quoting *Hertzler*, 221 S.E.2d at 150 ("The traditional definition of private nuisance involves an individual's use of his or her property in a manner that 'unreasonably interferes with the use and enjoyment of another's property.'")).

A public nuisance is a condition "that is a danger to the public." *Taylor v. City of Charlottesville*, 397 S.E.2d 832, 835 (Va. 1990). "If the annoyance is one that is common to the public generally, then it is a public nuisance . . . . [t]he test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights." *City of Va. Beach v. Murphy*, 389 S.E.2d 462, 463 (Va. 1990) (internal citations omitted).

### 2.   Anderson Fails to State a Claim for Either Private or Public Nuisance

Dr. Anderson does not specify whether she advances a claim for public or private nuisance. Because Anderson fails to allege sufficient facts to state a claim for either, the Court will dismiss the Nuisance Claim against Dr. McMahon and Ciemniecki.

First, if construed as a private nuisance claim, Dr. Anderson fails to state a claim. "The traditional definition of private nuisance involves an individual's use of his or her property in a manner that 'unreasonably interferes with the use and enjoyment of another's property.'"

*Hinton*, 2019 WL 4060339, at *4. Anderson alleges that "the physical presence of scents in Dr. Anderson's classroom at Page constitutes a nuisance." (Am. Compl. ¶ 44.)

Here, Dr. Anderson does not, and cannot, allege that the physical presence of scents interfered with *her* use and enjoyment of her property. Dr. Anderson cannot maintain an action for private nuisance because she did not legally own or occupy the land at issue: her classroom. The classroom belongs to the school, and as an employee of the school, Anderson does not have an interest in the property affected. *See Yoon*, 33 Va. Cir. 254; *see also Hinton*, 2019 WL 4060339, at *3 (finding plaintiff cannot state a claim for private nuisance where he or she "enjoys no property right" in the area where the injury occurred, there, a grocery store which was open to the public). Because Anderson has no property interest in her classroom or school land, she cannot maintain an action based on private nuisance.

Second, if construed as a public nuisance claim, Dr. Anderson's claim also founders. She does not, and cannot, allege that the use of scents by others interrupted or interfered with a public right or privilege common to the school community. Anderson explains that she suffers from "a sensitivity/allergy" to various scents in her classroom. (Am. Compl. ¶ 10.) To the extent her Exhibit A can properly be considered by the Court, Anderson has identified only one other teacher at Page with an irritation to scents in the classroom. (*See* Am. Compl., Ex. A.) Anderson's reaction to the scents in her classroom thus did not constitute an "annoyance . . . common to the public generally." *Murphy*, 389 S.E.2d at 463. Because, even read liberally, only two people were affected by the physical presence of scents in the classrooms at Page, the condition did not amount to a public danger and cannot be considered a public nuisance as a matter of law. *Id.*

Because Anderson does not plausibly allege sufficient facts to state a claim for either

private or public nuisance, the Court will grant the Motion to Dismiss as to Count IV, the

Nuisance Claim, against Dr. McMahon and Ciemniecki for failure to state a claim.

**B.      Count V: The Battery Claim**

The Court will dismiss Dr. Anderson's Battery Claim against Dr. McMahon and

Ciemniecki because she fails to plausibly allege facts sufficient to state such a claim.  In

Virginia, "the tort of battery is an unwanted touching which is neither consented to, excused, nor

justified." *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003).  "[B]attery is the unlawful

touching of the person of another by the aggressor himself." *Newsome v. Watson*, No. 2:14cv94,

2014 WL 2434566, at *4 (E.D. Va. May 28, 2014).  Battery "involves physical contact." *Wilson

v. Woods*, No. 3:16cv578, 2019 WL 4790913, at *10 (E.D. Va. Sept. 30, 2019).[50]

Dr. Anderson alleges that "McMahon and Ciemniecki caused unwanted touchings of Dr.

Anderson by permitting students to wear scents that McMahon and Ciemniecki knew would

cause . . . Anderson to experience life threatening reactions." (Am. Compl. ¶ 48.)  Anderson

cites no basis to claim that inhalation of an offensive scent in these circumstances constitutes

battery.  But even presuming a vaporous scent could effectuate a battery when entering another

person's nose or touching his or her skin, Anderson does not allege that the scent emanated from

McMahon and Ciemniecki.  Here, the physical presence of offensive scents in Anderson's

---

[50] Assault, often discussed alongside the tort of battery, but not alleged here, is "an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman*, 574 S.E.2d at 261 (citation and quotation omitted).  "Although these two torts 'go together like ham and eggs,' the difference between them is 'that between physical contact and the mere apprehension of it.'" *Id.* (citation and quotation omitted); *see also Wilson*, 2019 WL 4790913, at *10 (quoting *Koffman*, 574 S.E.2d at 261).

classroom came from the students, not from Dr. McMahon or Ciemniecki. No claim for battery can lie against them.

Dr. Anderson counters that Dr. McMahon and Ciemniecki "aided [and] abetted" the students in committing a battery against her. (Resp. Second Mot. Dismiss 26.) In *Daly v. Virginia*, a court in this district identified that the Supreme Court of Virginia has recognized that "[b]attery is the actual infliction of corporal hurt on another (e.g. the [] touching of another's person), willfully or in anger, whether by the party's own hand, or by some means set in motion by him [or her]." No. 3:14cv250, 2014 WL 2759078, at *9 (E.D. Va. June 17, 2014) (quoting *Jones v. Commonwealth*, 36 S.E.2d 571 (Va. 1946)). Even if Anderson could support a battery claim on an aiding and abetting theory, this claim would still fall short. The students did not physically touch Dr. Anderson. Anderson cites no basis to claim that inhalation of an offensive scent in these circumstances constitutes battery. And Anderson does not plausibly allege that the students wore the scent because McMahon and Ciemniecki willfully "set in motion" a circumstance for the students to wear scents; they had been doing so previously. *Daly*, 2014 WL 2759078, at *9. Because the tort of battery "involves physical contact," even under an aiding and abetting theory, Dr. Anderson fails to state a battery claim in accordance with Virginia law. *Wilson*, 2019 WL 4790913, at *10.

Therefore, Anderson fails to state a claim for battery against McMahon and Ciemniecki. The Court will dismiss Count V, the Battery Claim, for failure to state a claim under Rule 12(b)(6).

### C.   Count VI:  The Gross Negligence Claim

#### 1.   Legal Standard:  Gross Negligence Claims

To prove gross negligence under Virginia law, the plaintiff must show the basic elements

of negligence: "a legal duty, a violation of the duty, and a consequent injury." *Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). "The finding of a legal duty is a prerequisite to a finding of negligence." *Quisenberry v. Huntington Ingalls, Inc.*, 818 S.E.2d 805, 809 (Va. 2018) (internal citations omitted). "Without a legal duty there can be no cause of action for an injury." *Id.*

The question of whether a duty in tort exists "is a pure question of law." *Volpe v. City of Lexington*, 708 S.E.2d 824, 827 (Va. 2011). "[T]he imposition of a duty is nothing more than a threshold requirement that if satisfied, merely opens the courthouse doors." *RGR, LLC v. Settle*, 764 S.E.2d 8, 20 (Va. 2014) (internal citations omitted). Once a court determines that a duty exists, the jury weighs the evidence and determines whether the duty has been performed. *See id.* at 20. Virginia courts recognize, as a general matter, that there is "no duty of reasonable care imposed upon an employer in the supervision of employees." *Dowdy*, 365 S.E.2d at 754.

Should a duty exist, Virginia law defines gross negligence as "the utter disregard of prudence amounting to complete neglect of the safety of another. It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Volpe*, 708 S.E.2d at 828 (internal citations and quotations omitted). Indeed, gross negligence not only requires negligence that would shock fair-minded persons, but also provides that "there is not gross negligence as a matter of law where there is even the slightest bit of care." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). "Because the standard for gross negligence [in Virginia] is one of indifference, not inadequacy, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Fijalkowski v. Wheeler*, 361 F. Supp. 3d 577, 593 (E.D. Va. 2019) (internal citations and quotations omitted).

**2.    The Court Will Grant the Motion to Dismiss the Gross Negligence Claim Because Neither McMahon Nor Ciemniecki Owed Anderson a Duty of Care in Her Employment**

Because Dr. Anderson has not shown that either Dr. McMahon or Ciemniecki owed her a duty of care, the Court will dismiss the Gross Negligence Claim for failure to state a claim.

The Virginia Supreme Court has observed, "no duty of reasonable care [is] imposed upon an employer in the supervision of its employees." *Dowdy*, 365 S.E.2d at 754.  In *Dowdy*, the plaintiff based his negligence claim, like Dr. Anderson's gross negligence count here, on a theory that an employer had allowed conditions to persist in a manner which "aggravated plaintiff's illness."[51]  *Id.* at 752.  The Virginia Supreme Court found that even an employer's "unreasonable conduct" did not give rise to a "duty of reasonable care imposed upon an employer in the supervision of its employees." *Id.* at 754.

*Dowdy* is on all fours with the instant case.  As in *Dowdy*, Dr. Anderson alleges that Dr. McMahon and Ciemniecki aggravated her illness via the conditions of employment under which they required her to work.  *Id.* at 752.  But McMahon and Ciemniecki, as Anderson's supervisors, did not owe Anderson a duty of care in that capacity.[52]  Therefore, they cannot be

---

[51] In *Dowdy*, the plaintiff charged that his employer exhibited negligent supervision when negligently responding to the work-related consequences of his irritable bowel syndrome. In circumstances nearly identical to the instant ADA case, Dowdy asserted that his employer knowingly exacerbated his physical and mental condition, especially when ultimately discharging him for, among other issues, absenteeism.  The *Dowdy* court concluded that Dowdy could not bring his claim of negligent supervision because no duty of care existed.

[52] The Court acknowledges that *Dowdy* predates by decades *RGR* and *Quisenberry*, which created an expansive view of "duty" under Virginia law.  But Virginia courts continue to treat *Dowdy* as good law.  *Quisenberry* relied on *Dowdy*, and recently the Virginia Supreme Court cited *Dowdy* for the same proposition as this Court does here: "[o]ur precedent, however, has held that an employer has no general duty to supervise one employee to protect another employee from intentional or negligent acts." *A.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 470 (Va. 2019).  While some courts in the Eastern District of Virginia have suggested a more limited reading of *Dowdy*, *see, e.g.*, *Adams v. NaphCare, Inc.*, 244 F. Supp. 3d 546, 551

held liable for a negligence claim as a matter of law, *id.* at 754, Anderson's claims cumulative harm notwithstanding.[53]

Because Virginia law makes clear that the finding of a legal duty is a prerequisite to a finding of negligence, and no legal duty exists here, the Court will dismiss Count VI, the Gross Negligence Claim, against both Dr. McMahon and Ciemniecki for failure to state a claim under Rule 12(b)(6).

---

(E.D. Va. 2017), others have interpreted *Dowdy* as foreclosing a Virginia "cause of action for negligent supervision," *Pini v. Staybright Elec. of Colo., Inc.*, No. 1:17cv739, 2018 U.S. Dist. LEXIS 124076 at *14 (E.D. Va. Jan. 22, 2018).

Furthermore, when sitting in diversity, a "federal court must apply the law of the state" by looking to the decisions of that state's highest court. *See United States v. Little*, 52 F.3d 495, 498 (4th Cir. 1995); *see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) ("the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted."). Considering the similarities of *Dowdy* to the case at bar, as well as the Virginia Supreme Court's rulings confirming *Dowdy*'s status, the Court reads the application of *Dowdy* to this case as barring a cause of action for gross negligence against McMahon and Ciemniecki here.

[53] Even if the Court were to presume that McMahon and Ciemniecki owed a duty to Dr. Anderson, this record plainly shows that they exercised some degree of care to prevent harm to Anderson given her allergies. For instance, McMahon suggested expressing classroom needs about allergy awareness on her syllabus and making Anderson's classroom an allergy awareness space, including informing students to check with Anderson before wearing certain scents in the classroom. (Am. Compl. ¶ 15.) They met with her VEA representative about accommodations and, although Anderson thought it inadequate, she alleges McMahon and Ciemniecki prepared a letter listing the accommodations the School Board was willing to undertake. (*Id.* ¶ 19.) And McMahon changed the policy of forbidding Anderson from calling parents concerning scents, allowing her to do so on October 4, 2017. (*Id.* ¶ 22.)

Even reading the Amended Complaint favorably, and as true, the Court would have trouble finding that Defendants' conduct amounted to indifference or inadequacy applying Virginia law. But absent that, their conduct does not come close to exhibiting an "utter disregard of prudence amounting to complete neglect of the safety" of Dr. Anderson, nor does it amount to "a heedless and palpable violation of legal duty" amounting to "the absence of slight diligence or the want of even scant care." *Elliott*, 791 S.E.2d at 732–33 (internal citations and quotations omitted).

**D.**   **Count VIII:  The Defamation *Per Se* Claims**[54]

In Count VIII, Dr. Anderson alleges that Dr. McMahon and Ciemniecki made false

statements constituting defamation *per se* because they "accuse and impute to . . . Anderson an

unfitness to perform the duties of an office or employment." (Am. Compl. ¶ 60.) Because none

of the six statements advanced by Anderson constitutes defamation *per se* as a matter of law, the

Court will grant the Motion to Dismiss to Count VIII, the claims of Defamation *Per Se*.

**1.**   **Legal Standard:  Defamation *Per Se***

Virginia has identified certain statements "as defamation *per se*: (1) statements that

impute to a person the commission of some criminal offense involving moral turpitude, for

which the party, if the charge is true, may be indicted and punished, . . . (3) statements that

impute to a person unfitness to perform the duties of an office or employment of profit, or want

of integrity in the discharge of duties of such an office or employment, and (4) statements that

prejudice such person in his or her profession or trade." *Hatfill v. N.Y. Times Co.*, 416 F.3d 320,

330–31 (4th Cir. 2005) (internal quotation marks and citations omitted).

A plaintiff seeking to recover for defamation *per se* in Virginia "must allege a publication

of false information concerning the plaintiff that tends to defame the plaintiff's reputation." *Id.*

at 330.  Such defamation allegations must show the "(1) publication of (2) an actionable

statement with (3) the requisite intent." *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005).  "If

the statements at issue are either not defamatory, objectively true, or protected expressions of

opinion, there is no actionable defamation." *Cook, Heyward, Lee, Hopper, & Feehan, P.C. v.*

---

[54] Because Count VII, the Common Law Conspiracy Claim, relies on Count VIII, the
Defamation Claim, for its viability, the Court considers those claims in reverse order.

*Trump Va. Acquisitions LLC*, No. 3:12cv131, 2012 WL 1898616, at *3 (E.D. Va. May 23, 2012) (citation omitted).

Under the second prong, when alleging an actionable statement, the plaintiff "must prove by a preponderance of the evidence that the allegedly defamatory statements are both false[55] and defamatory." *Cook*, 2012 WL 1898616, at *3 (citing *Chapin*, 993 F.2d at 1092). A statement may be deemed defamatory if "the allegedly defamatory words [] carry 'the requisite defamatory "sting" to one's reputation.'" *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 507 (E.D. Va. 2016) (quoting *Schaecher v. Bouffault*, 772 S.E.2d 589 (Va. 2015)). "Such language is of the kind that 'tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous.'" *Id.* (quoting *Bouffault*, 772 S.E.2d 589). A statement that "deter[s] third persons from associating or dealing with" the subject of the statement also is defamatory. *Chapin*, 993 F.2d at 1092. "Defamatory statements may include statements made by inference, implication, or insinuation." *Hyland v. Raytheon Tech. Serv. Co.*, 670 S.E.2d 746, 750 (Va. 2009) (citations omitted).

"Expressions of opinion . . . are constitutionally protected and are not actionable as defamation." *Id.* at 750. Whenever an allegedly defamatory statement "cannot be objectively characterized as true or false," *Jordan*, 612 S.E.2d at 206, or "is relative in nature and depends largely on a speaker's viewpoint," that statement is one of opinion. *Hyland*, 670 S.E.2d at 751;

---

[55] "At the motion to dismiss stage, the Court must accept as false any statements which the Complaint alleges to be false." *McCray v. Infused Sols., LLC*, No. 4:14cv158, 2017 WL 4111958, at *3 (E.D. Va. Sept 15, 2017) (citing *Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). Thus, if the statements are presumed false, a court's analysis in a motion to dismiss turns on whether the statement is defamatory.

*see also Dragulescu*, 223 F. Supp. 3d at 507 (opinions cannot be proven false (citing *Gov't Micro Res., Inc. v. Jackson*, 624 S.E.2d 63 (Va. 2006))); *Fuste v. Riverside Healthcare Ass'n*, 575 S.E.2d 858 (Va. 2003) (speaker's viewpoint is opinion). The matter of whether a statement is one of fact or one of opinion is a question of law for the trial court to decide. *Hyland*, 670 S.E.2d at 750. In determining whether a statement constitutes fact or opinion, a court must consider the statement as a whole rather than isolate any portion of the statement. *Id.* at 751.[56]

When all elements of defamation are plausibly pled, the claim can be defeated by a finding of privilege, absolute or qualified. *Dragulescu*, 223 F. Supp. 3d at 508. If a privilege has attached, a plaintiff may only overcome it by an adequate showing of malice. *Id.* (citing *Great Coastal Exp., Inc. v Ellington*, 334 S.E.2d 846, 853 (1985)). The Virginia Supreme Court has held "that employment matters are occasions of privilege in which the absence of malice is presumed." *Dragulescu*, 223 F. Supp. 3d at 508 (citing *Larimore v. Blaylock*, 528 S.E.2d 119, 122 (Va. 2000)). Whether a privilege has attached is a question of law, but whether a defendant has lost or abused a privilege is a question of fact. *Dragulescu*, 223 F. Supp. 3d at 508 (internal citations omitted).

Finally, Virginia law sets the statute of limitations for a defamation claim at one year. *See* VA. CODE ANN. § 8.01-247.1 ("Every action for injury resulting from libel, slander, insulting words, or defamation shall be brought within one year after the cause of action accrues.").

---

[56] The third element of defamation, intent, is not at issue here. Where public officials are not involved, Virginia law requires a showing of negligence. *Dragulescu*, 223 F. Supp. 3d at 508 (citing *Gazette v. Harris*, 325 S.E.2d 713, 725 (Va. 1985)). The level of intent behind any alleged defamation is a question generally reserved for the finder of fact. *Id.*

### 2.   Anderson Does Not State an Actionable Claim for Defamation *Per Se*

Dr. Anderson alleges six defamatory statements: five made by Dr. McMahon and one by Ciemniecki.  (Am. Compl. ¶ 59.)  Anderson alleges that these six statements establish defamation *per se* because they impute to Anderson an "unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of duties of such an office or employment." *Hatfill*, 416 F.3d at 330–31.  Because, even reading the allegations favorably and reading each statement as a whole, Dr. Anderson fails to allege sufficient facts to show that any of the six statements constitute defamation *per se* as a matter of law, the Court will grant the Motion to Dismiss the Defamation *Per Se* Claims in Count VIII.  The Court addresses each alleged instance of defamation *per se* seriatim.

#### a.   The First and Second Statements Do Not Constitute Defamation *Per Se* Because They Are Both Time Barred and Likely Express Opinions

Dr. Anderson describes the first allegedly *per se* defamatory statement as a September 26, 2017 email[57] sent by Dr. McMahon to unidentified recipients, stating:

> As I have stated previously, I fear that Wendi Anderson will do or say something that will harm the students in her care.  I have lost faith in her ability to keep students safe.  I am maintaining the documentation narrative and will begin a google doc to make sharing easier.  Thank you.

(Am. Compl. ¶ 59.)

The full allegation as to the second basis for defamation is the following:  "On October 15, 2017, McMahon falsely accused Dr. Anderson of engaging in a 'pattern of unprofessional behavior' both in 2016 and 2017."  (*Id.*)  Anderson does not allege in what manner or to whom

---

[57] For readability, the Court again eliminates stray characters from the submitted emails.

the false accusation was uttered. (*Id.*) These two statements do not constitute defamation *per se* for two reasons: (1) they were made outside the statute of limitations; and, (2) they likely constitute statements of opinion.

First, both statements were made outside the statute of limitations. Dr. McMahon made and "published" the statements on September 26, 2017, and October 15, 2017, respectively: more than one year before Dr. Anderson filed her lawsuit on October 30, 2018. "Failure to file within the statute of limitations is treated as a failure to state a claim." *Henderson v. Fairfax-Falls Church Cmty. Serv. Bd.*, No. 1:18cv825, 2018 WL 6037522 at *4 (E.D. Va. Nov. 15, 2018). As a result, the Court will dismiss the Defamation *Per Se* Claim against McMahon as to these two statements for failure to state a claim.

Second, even if the Court were to address these statements, they likely would not constitute defamation because, even viewed favorably and considered as a whole, both statements express Dr. McMahon's opinion. As to McMahon's September 26, 2017 email, the qualifying words "I fear" at the beginning of her statement show that it is relative and based on her viewpoint. *See Raytheon Tech. Servs. Co. v. Hyland*, 641 S.E.2d 84, 92 (Va. 2007) (finding that statement qualified by "appeared to be" showed the statement was conveyed from the perspective of the writer and was an opinion statement as a result). Similarly, McMahon's loss of faith is just that—McMahon's own opinion as to Anderson's ability to keep students safe. The email, considered as a whole, likely could not be considered defamation.

As to McMahon's second allegedly *per se* defamatory statement on October 15, 2017, McMahon's proclamation that Anderson displayed "'a pattern of unprofessional behavior' . . . in 2016 and 2017," (Am. Compl. ¶ 59), Anderson offers no context about the statement: she does not say whether it was oral or written, and she does not identify to whom it was published. (*Id.*)

This alone evinces deficient pleading because it does not plausibly plead publication. Even presuming she could pass the hurdle of establishing publication, McMahon's statement cannot be "objectively characterized as true or false." *Jordan*, 612 S.E.2d at 206. The statement regarding Dr. Anderson's allegedly unprofessional behavior "depends largely on a speaker's viewpoint" concerning professionalism in the workplace, and courts uniformly hold those sorts of statements to be "an expression of opinion." *Hyland*, 670 S.E.2d at 751; *see also Nigro v. Va. Commonwealth Univ.*, 492 F. App'x 347, 356 (4th Cir. 2012) (concluding that supervisor's statements regarding lack of progress were opinions because they were based on supervisor's perceptions of employee's progress and could not be proven false). As a result, even if the Court were to consider Anderson's Defamation *Per Se* Claim as to two these untimely statements, they likely express opinions and could not be actionable as defamation *per se*.

> **b.     The Third Statement Cannot Constitute a Claim for Defamation *Per Se* Because Anderson Does Not Allege That It Was Published to a Third Party or that it was Defamation as Defined by Virginia Law**

Dr. Anderson suggests that the third *per se* defamatory statement stems from the fact that "[i]n February 2018, McMahon placed Dr. Anderson on a [performance improvement plan], falsely stating that Dr. Anderson had 'deficits in Standard 2, Standard 3, Standard 5 and Standard 6.'" (Am. Compl. ¶ 59.) This statement does not constitute an actionable statement of defamation *per se* because Anderson does not allege that McMahon published the statement to a third party. *Jordan*, 612 S.E.2d at 206.

In the Amended Complaint, Anderson alleges that Dr. McMahon placed her on a performance improvement plan ("PIP") and falsely stated she had deficits in several performance standards. (Am. Compl. ¶ 59.) Anderson does not make any claim about the statement being

77

shared with a third party. As a result, this aspect of Anderson's defamation claim fails to meet the first requisite "publication" element for defamation *per se*.

Even presuming this PIP and evaluation were published to a third party, read favorably and as a whole, Anderson does not allege anything about them from which a finding of defamation could flow, or even be inferred. She does not include any plausible claim that knowledge of the PIP rose above that of a supervisor's opinion to "throw . . . shame, or disgrace upon [her], or which tend[ed] to hold [her] up to scorn, ridicule, or contempt, or which [was] calculated to render [her] infamous, odious, or ridiculous." *Dragulescu*, 223 F. Supp. 3d at 507–08 (quoting *Bouffault*, 772 S.E.2d at 589); *Hyland*, 670 S.E.2d at 751.

Because Anderson did not plausibly plead: (1) publication; (2) that the PIP and evaluation reflect an opinion which would "deter third persons from associating or dealing with" Anderson; or, (3) that they carry the requisite sting to make Dr. Anderson appear "odious, infamous, or ridiculous," *Chapin*, 993 F.2d at 1092, the third statement does not constitute an actionable claim for defamation *per se*.

        **c.**     **The Fourth Statement Cannot Support a Claim for Defamation *Per Se* Because It Would Not Rise to the Level of Causing Prejudice to Anderson In Her Profession and It Constitutes a Statement of Opinion**

Dr. Anderson premises the fourth allegedly *per se* defamatory statement on a March 12, 2018 email sent by Dr. McMahon to Chuck Wagner, the Assistant Superintendent for Instructional Services on the Gloucester County School Board, regarding "Keith Hodges." Absent salutation, the email states in full:

> This teacher tends to not plan things well, so I have asked that she is specific in this request. I do not yet have confirmed dates/times (and so, I am guessing he will not be at school today). Do you have any considerations or suggestions? There is a story behind this that I can share with you later. Thank you.

(Am. Compl. ¶ 59.) But Dr. Anderson cannot base an action for defamation *per se* on this statement for two reasons: (1) it does not cause Anderson to suffer prejudice in her profession; and, (2) the statement reflects Dr. McMahon's opinion.

First, the statement is not defamation *per se* because it does not rise to the level of causing Dr. Anderson to suffer prejudice in her profession. (*Id.*) Even drawing all reasonable inferences in favor of Anderson and considering the statement as a whole, the comment that she does not "plan things well" is at most an "offensive or unpleasant statement[]," but not one that makes Anderson appear "odious, infamous, or ridiculous," *Chapin*, 993 F.2d at 1092, so as to cause prejudice to Anderson in her profession.

Second, the statement expresses Dr. McMahon's opinion. The qualifying words "tends to" indicate the statement arises from McMahon's viewpoint. *See Raytheon*, 641 S.E.2d at 92 (finding that statement qualified by "appeared to be" showed the statement was conveyed from the perspective of the writer and was an opinion statement as a result); *see also Nigro*, 492 Fed. App'x. at 356 (concluding that the statement that "[p]laintiff has poor time management with respect to internal medicine rotation" was not actionable because it was an opinion). Additionally, the statement that Anderson "tends not to plan things well" cannot be objectively proven true or false. *See Nigro*, 492 Fed. App'x. at 356. Consequently, the statement "is relative in nature and depends largely on a speaker's viewpoint" rendering it "an expression of opinion." *Hyland*, 670 S.E.2d at 751.

Because the fourth statement reflects an opinion and would not "deter third persons from associating or dealing with" Anderson, and it does not carry the requisite sting to make Dr. Anderson appear "odious, infamous, or ridiculous," *Chapin*, 993 F.2d at 1092, the statement is not an actionable as defamation *per se*.

### d.    The Fifth Statement Does Not Constitute Defamation *Per Se* Because It Is Based on the Ciemniecki's Opinion

The fifth allegedly *per se* defamatory statement is the only one attributed to Ciemniecki. Dr. Anderson alleges that Ciemniecki sent an email to "McMahon and others" stating "[w]e wish her well with [h]er 'way worse' illness and keep it moving . . ." (Am. Compl. ¶ 59.) Anderson does not provide a copy of the email, and that is the only phrase from the Ciemniecki email included in the Amended Complaint.

The paragraph before this allegation, however, posts a copy of an April 16, 2018 email that Dr. Anderson sent to Jesse Dutton, Assistant Principal at Page.[58] As reflected in the Amended Complaint, Anderson states in that email that she is about to go out on leave, that her health is "declining rapidly," that she is unsure of her return date, and that her doctors have warned her that if, upon return, she "started having the same signs as [she] did in September, not to ignore [her] body's reactions because it *could, and probably would, be way worse this time.*" (Am. Compl. ¶ 59 (emphasis added)).

---

[58] The full text of the substantive part of Dr. Anderson's email is as follows:

Mr. Dutton,

I tried to catch you before lunch, but it seems you [were] still out for your meeting. I would like to show you my survey results in survey monkey so you can verify the authenticity and honest of my reporting before I go out sick again. I wanted to get this week's work started and the main components of the direct instruction so that if need be [sic], I could create the lessons and practice items at home for the students. My health is declining rapidly, however, and I do not know when I will be able to return. I do not know how this will affect my directives that I'm doing everything in my power to comply with, however, the doctors warned me if I started have the same signs as I did in September, not to ignore my body's reactions because it could, and probably would, *be way worse this time.*

(Am. Compl. ¶ 59 (emphasis added)).

The plain meaning of the Ciemniecki responsive email is not entirely evident. The Court notes that it cannot consider the statement as a whole because Anderson did not include a full statement in the Amended Complaint. But even reading its upshot favorably to Dr. Anderson's claim, the statement does not rise to the level of defamation *per se*. It either just quotes Anderson's email, or expresses a sentiment of the speaker, Ciemniecki. *See Hyland*, 670 S.E.2d at 750. The statement "is relative in nature" and based Ciemniecki's viewpoint. *Id.* at 751. Like an opinion, Ciemniecki's sentiment "cannot be objectively characterized as true or false" and therefore does not rise to the level of defamation *per se*. *Jordan*, 612 S.E.2d at 206.

More on point, the statement as presented in the Amended Complaint cannot be considered defamation *per se* because it does not make Dr. Anderson appear "odious, infamous, or ridiculous." *Chapin*, 993 F.2d at 1092. Drawing all inferences in Dr. Anderson's favor and in context with her email, Ciemniecki's repetition of Anderson's wording reasonably could be read to suggest sarcasm or some level of disbelief towards Dr. Anderson, perhaps indicating that Anderson has exaggerated her illness. But even if the statement conveyed a belief that Anderson had been dishonest, that statement does not "render [Anderson] odious, infamous, or ridiculous." *Bouffault*, 772 S.E.2d at 599. In *Bouffault*, the defendant stated that the plaintiff had not been "totally truthful" in certain business dealings. *Id.* The Virginia Supreme Court found that such a characterization might be deemed "unpleasant," but did not "meet the threshold for defamatory 'sting' to engender disgrace, shame, scorn, or contempt, or to render one odious, infamous, or ridiculous." *Id.* Here, too, Anderson might dislike the implication that she misrepresented the scope of her illness, but Ciemniecki's statement does not make her appear "odious, infamous, or ridiculous" and thus cannot constitute defamation *per se*. *Id.*; *Chapin*, 993 F.2d at 1092.

Because Ciemniecki's statement does not carry the requisite sting to make Dr. Anderson appear "odious, infamous, or ridiculous," *id.*, Anderson has not satisfied the second element of a claim for defamation *per se*. Because this is the only statement that Anderson alleges that Ciemniecki made, the Court will dismiss the Defamation *Per Se* Claim against Ciemniecki.

> **e.** **The Sixth Statement Does Not Constitute Defamation *Per Se* Because It Does Not Rise to the Level of a Defamatory Comment Towards Anderson**

Finally, the sixth allegedly defamatory statement, an April 18, 2018 email sent by McMahon stated that:

> Wendi has not reported any incidents to administration, the school nurse, or main office staff. She has been directed repeatedly to report any incidents as they happen and has been directed to see the school nurse when she is in distress. She has been offered numerous accommodations to support her needs. She has not chosen to follow the recommendations nor has she has requested supports or accommodations for many months. She has not reported at any time that she has been in distress. She has not seen the school nurse. Thank you [Craig Smith] for reminding her to follow-through with the company nurse. Unfortunately, we will have no documentation at school to support her report.

(Am. Compl. ¶ 59.) McMahon sent this email to Ciemniecki and several other colleagues. (*Id.*)

Dr. Anderson claims that this email calls into question her credibility and honesty. (*Id.*) She adds that the email falsely states that she never reported any incidents, reported any distress, failed to follow recommendations for months, and implied that she had "rebuffed all help that the School Board, McMahon, and Ciemniecki offered." (*Id.*)

Dr. Anderson's arguments do not prevail. Although some propositions in the email are subject to being proven true or false (such as never reporting incidents or distress), even reading the email favorably and as a whole, nothing within it constitutes defamation because it does not carry the requisite sting to make Anderson appear "odious, infamous, or ridiculous." *Chapin*, 993 F.2d at 1092. The Amended Complaint certainly includes specific incidents reported by

Anderson and the distress they caused. But McMahon's observation that Anderson has not reported incidents, requested support, or has chosen not to follow directives is limited in time ("for many months"), so it does not connote "the requisite defamatory 'sting' to one's reputation," *Dragulescu*, 223 F. Supp. 3d at 507, nor could it be deemed something that would "deter third persons from associating or dealing with" Anderson. *Chapin*, 993 F.2d at 1092.

While some negative connotation could flow from Dr. McMahon's choice to conclude her thoughts by using the word "unfortunately," (Am. Compl. ¶ 59), it can suggest either that she disapproves of Dr. Anderson's failure to report, or that she regrets that the school will have no documentation to support Dr. Anderson's needs. In any event, even considering these statements as disapproving and as a whole, they would not prejudice Anderson in her profession as defined under Virginia defamation law. A recent failure to report incidents, request support, and visit the school nurse as directed does not rise to the level of characterizing Anderson as odious, infamous, or ridiculous. The sixth statement also fails to state a claim for defamation *per se*.

    **3.**    **None of the Six Statements in the Amended Complaint Supports a Claim for Defamation *Per Se***

Because Dr. Anderson has alleged insufficient facts to support her claims of defamation *per se*, the Court will grant the Motion to Dismiss on Count VIII, the Defamation *Per Se* Claim, against Dr. McMahon and Ciemniecki.

**E.**    **Count VII: The Common Law Conspiracy Claim**

    **1.**    **Legal Standard: Common Law Conspiracy**

In Virginia, a plaintiff asserting common law conspiracy must allege that "two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 845 (4th Cir. 2004). A conspiracy claim must relate

to an underlying tort. *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 896 (Va. 1997).

### 2.     Anderson Does Not Plead Sufficient Facts to Establish a Virginia Common Law Claim for Conspiracy to Commit Defamation

Dr. Anderson does not plausibly allege sufficient facts to support a claim of conspiracy to commit defamation because, as explained above, even reading her allegations favorably, she does not allege the qualifying underlying tort of defamation. A conspiracy claim must relate to an underlying tort. *Halifax Corp.*, 484 S.E.2d at 896. Because Anderson has not stated a claim for defamation, no "criminal or unlawful purpose" exists to support her conspiracy claim. *T.G. Slater*, 385 F.3d at 845. The Court will therefore dismiss Count VII, the Common Law Conspiracy Claim, against McMahon and Ciemniecki for failure to state a claim under Rule 12(b)(6).

### V.  Conclusion

For the foregoing reasons, the Court will deny the Defendants' Motion to Dismiss in Count I as to Dr. Anderson's ADA failure to accommodate claim against the School Board. The Court will grant the Motion to Dismiss in Count I as to all claims against Dr. McMahon and Ciemniecki, and as to the disparate treatment, retaliation, and § 1983 claims against the School Board. The Court will also grant the Defendants' Motion to Dismiss on Counts II through VIII in their entirety. Because the Court has dismissed all of the claims against Dr. McMahon and Ciemniecki, the Court will dismiss them as defendants in this matter.

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: May 29, 2020
Richmond, Virginia

84