IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WENDI H. ANDERSON,
  Plaintiff,

  v.              Civil No. 3:18cv745 (DJN)

THE SCHOOL BOARD OF
  GLOUCESTER COUNTY,
  Defendant.

## MEMORANDUM OPINION

Plaintiff Wendi Anderson ("Plaintiff") brings this action alleging violations of the American with Disabilities Act ("the ADA"). This matter comes before the Court on Defendant School Board of Gloucester County's ("Defendant") Motion for Summary Judgment (ECF No. 92), moving for summary judgment on Plaintiff's lone remaining claim. For the reasons set forth below, the Court will GRANT Defendant's Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

The Court will start by listing the undisputed material facts. Pursuant to Local Rule 56(B), Defendant included a section listing all undisputed material facts. (Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 93) at 3-15.) Defendant cited to the portions of the record supporting its contentions. Local Rule 56(B) also requires that the party opposing summary judgment list all material facts "as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." Likewise, Federal Rule of Civil Procedure 56 requires that a party cite to particular parts of the record when asserting that a fact is genuinely disputed.

Here, Plaintiff responds to Defendant's list of undisputed material facts with a counterstatement that either agrees or disputes each fact listed by Defendant. (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") (ECF No. 107) at 4-27.) However, Plaintiff rarely cites to particular parts of the record in attempting to create disputes of fact. Instead, Plaintiff includes an affidavit that simply attests to the accuracy of the facts contained in the counterstatement. (Decl. of Wendi Anderson (ECF No. 107-1) ¶ 8.) For most of the few record citations that she does include, Plaintiff merely cites to her interrogatory answers that contain her own uncorroborated narrative of the events. However, "the law is well established that uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment." *DiQuollo v. Prosperity Mortg. Corp.*, 984 F. Supp. 2d 563, 570 (E.D. Va. 2013). If a plaintiff opposes summary judgment with an affidavit, "that affidavit must present evidence in substantially the same form as if the affiant were testifying in court. A memorandum of law or brief will not suffice." *Blair v. Colonnas Shipyard Inc.*, 52 F. Supp. 2d 687, 692 (E.D. Va. 1999) (cleaned up). Accordingly, Plaintiff's counterstatement, where not supported by citations to the record, will not suffice to dispute the well-supported facts that Defendant lists.

When ruling on a motion for summary judgment, "the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. R. 56(B). Because Plaintiff did not properly dispute most of the facts with citations to the record, the Court will assume that Plaintiff admits the facts that Defendant cites, unless Plaintiff controverted such facts with support from the record. In any event, this case ultimately boils down to the accommodations that Plaintiff requested and those that Defendant offered. Although

2

the parties may characterize them differently, the undisputed documents show the accommodations requested and offered.

### A.     Plaintiff's Employment

Gloucester County Schools employed Plaintiff as a teacher beginning in 2006 until her disability retirement began in 2019. (Dep. Tr. of Wendi Anderson ("Anderson Dep.") (ECF No. 93-1) at 53:5-7; Plaintiff's Interrogatory Responses ("Pl.'s Interrog." (ECF No. 93-2) at 321).) Plaintiff held various teaching positions at Page Middle School throughout her employment, including as an eighth-grade language arts teacher during the 2017-18 school year, the school year at issue in this dispute. (Anderson Dep. at 53:8-61:21.) The job description for Plaintiff's position lists 22 essential duties, including:

1.  Meets and instructs classes in the locations and at the times designated;

2.  Plans a program of study that, as much as possible, meets the individual needs, interests, and abilities of the students and state and local objectives;

3.  Creates a classroom environment that is conducive to learning and appropriate to the maturity and interests of the students;

4.  Prepares for classes assigned, and shows written evidence of preparation upon request of immediate superior;

5.  Employs a variety of instructional techniques and instructional media, consistent with the physical limitations of the location provided and the needs and capabilities of the individuals or student groups involved.

(Ex. A to Decl. of Patricia McMahon ("McMahon Decl.") (ECF No. 93-3).)

During the 2017-18 school year, approximately 700 students and staff came in and out of the building every day. (McMahon Decl. ¶ 4.) Plaintiff came into contact with between 60 and

at least 120 students per day.  (McMahon Decl. ¶ 4.)  Most students, staff and visitors to the school moved throughout the building over the course of a school day.  (McMahon Decl. ¶ 19.)

### B.    Plaintiff's Scent Sensitivity

Plaintiff claims that she suffers from a sensitivity to certain scents.  (Anderson Dep. at 32:15-17.)  The scents that cause her the most distress include vanilla, cocoa butter, coconut, florals, fruits, musk and patchouli.  (Anderson Dep. at 92:7-93:4.)  She claims that she "is highly allergic to many scented lotions, perfumes, hand sanitizers, and body sprays (such as AXE and Victoria's Secret)," with those seven scent categories causing the most distress.  (Ex. E to McMahon Decl.)  Even a small amount of scent, undetectable by others, can cause her to have a reaction.  (Anderson Dep. at 185:7-14; 198:10-14.)

Plaintiff claims that the symptoms of her reactions include some combination of the following:  allergic rhinitis; post nasal drip; sore throat; swelling in the neck; cough; difficulty breathing, dry heaving; intense back pain; impaired cognition; neuropathy; fatigue; cramping; eye twitches; buzzing feeling in head; migraines; blurry vision; dizziness; tinnitus; sensitivity to cold; occasional skin flushing; occasional vomiting; ear pain; hoarseness; intermittent tingling in extremities; leaking urine; liquid oozing between toes; breast discharge; cervical ovarian cysts; nausea; heart skipping; and, other forms of autonomic nervous system dysfunction.  (Pl.'s Interrog. at 267, 271-73.)

### C.    Plaintiff's Request for Accommodations Before 2017

In November 2008, Plaintiff requested approval from then-principal David Daniel to send home a written notice to parents regarding her sensitivity to scents.  (Decl. of David S. Daniel ("Daniel Decl.") (ECF No. 93-4) ¶ 4.)  Daniel approved the letter, which spoke generally of fragrance sensitivities and the need to avoid certain products at school.  (Daniel Decl. ¶ 5; Ex. A

4

to Daniel Decl.)  The letter did not specifically mention Plaintiff and did not prohibit students from using any particular scent or product.  (Ex. A to Daniel Decl.)  Instead, the letter requested that parents keep in mind the need to minimize fragrances that could cause difficulties.  (Ex. A to Daniel Decl.)

At the beginning of the 2013-14 school year, Plaintiff requested approval from then-principal Virginia Sanford to send home a communication regarding her scent sensitivity that included the expectation that students not wear deodorant or have deodorant in their belongings.  (Decl. of Virginia Sanford ("Sanford Decl.") (ECF No. 93-7) ¶ 5.)  Sanford did not permit Plaintiff to send this letter home, because it incorrectly implied that the school banned deodorant.  (Sanford Decl. ¶ 6.)  Sanford told Plaintiff that she could send home a revised notification that contained appropriate requests regarding her scents.  (Sanford Decl. ¶ 7.)  Plaintiff did not ask Sanford for any additional accommodations that year or in subsequent years.  (Sanford Decl. ¶¶ 8-9.)

During Plaintiff's time as a teacher, students could face discipline for the intentional use of scents against Plaintiff in an effort to harm her.  (Sanford Decl. ¶ 14.)  However, this discipline stemmed from the students' intentionally harmful behavior, not the use of scents.  (*See, e.g.*, Sanford Decl. ¶ 14 ("Although students could be disciplined for deliberately using scents against Plaintiff in an attempt to harm her, it was the students' intentionally harmful behavior, not the use of scent itself, that was the impetus for punishment.").)  Similarly, during Plaintiff's time as a teacher, the administration did not allow Plaintiff to single out students or remove students from the classroom for wearing particular scents.  (*See, e.g.*, Sanford Decl. ¶ 11 ("I have never agreed that Plaintiff could single out or isolate students, remove students from the classroom, or discipline students solely for wearing particular scents.").)

5

### D.      The 2017-18 School Year

This lawsuit centers around the 2017-18 school year.  Dr. Patricia McMahon became principal of Page Middle School at the beginning of the 2016-17 school year, and she remained principal in the 2017-18 school year.  (McMahon Decl. ¶ 2.)  Plaintiff did not have a conversation with Dr. McMahon about her scent sensitivity or accommodations during the 2016-17 school year.  (Anderson Dep. at 499:1-19; McMahon Decl. ¶ 6.)

On August 28, 2017, Plaintiff emailed Dr. McMahon, indicating that she planned to send a note to parents regarding her scent sensitivity, either through the syllabus or on a separate form for the parents to sign.  (Anderson Dep. at 87:4-89:2.)  Dr. McMahon requested that Plaintiff provide medical documentation for her sensitivity.  (McMahon Decl. ¶ 6.)  In response, Plaintiff provided a letter from her primary care provider, Shannon Burris, CFNP.  (McMahon Decl. ¶ 7.)  In her letter, Burris recommended that Plaintiff "be allowed to ask her students and parents to not use the following products when in her presence:  Hand sanitizer; Lotions; Body sprays; Topicals containing vanilla, coconut, floral/fruity scents; cocoa butter; Musks; Patchouli," and further requested that "if any scent causes Ms. Anderson to react and become unbearable, that she be allowed to move her class or student to another location."  (Ex. B to McMahon Decl.)

On September 1, 2017, Dr. McMahon sent an email to Plaintiff stating that "should you find that any scent causes you a reaction you find unbearable, please notify the Main Office at Page.  Once notified that you need assistance, your classroom will be covered so that you may remove yourself from the location where there is a scent causing a reaction."  (Ex. C to McMahon Decl.)  Dr. McMahon also made the school nurse available.  (Ex. C to McMahon Decl.)

6

Additionally, on or around the first day of school, Denise Dubois, the school nurse, stressed the need to limit the use of products that Burris identified while giving her annual talk to all students in Physical Education and Health classes. (Decl. of Denise Dubois ("Dubois Decl.") (ECF No. 93-12) ¶ 4.) Dubois also created "allergy awareness classroom" signs for Plaintiff's classroom and spoke with each of Plaintiff's classes regarding their use of fragrances. (Dubois Decl. ¶ 5.)

On September 7, 2017, Dr. McMahon authorized sending the following letter to all students, parents and staff:

> Due to increasing allergies and asthma issues at Page Middle School, we request that all fragrances, deodorant aerosols and other aerosols, perfumes, air fresheners, and perfumed hand lotions not be brought to school. We appreciate your cooperation and assistance as we work to ensure the comfort and safety of our students and staff.

(Ex. D to McMahon Decl.)

On September 11, 2017, Dr. McMahon requested that the custodial staff use only warm water, not any scented products, to clean the desks and floor in Plaintiff's classroom. (McMahon Decl. ¶ 12.) Likewise, on that day, Plaintiff experienced "one of the worst reactions [she] had" due to gum that a student had chewed. (Anderson Dep. at 207:9-22.)

On September 15, 2017, Plaintiff sent Dr. McMahon a proposed plan of how she intended to address her allergies with students and parents, as well as her requested accommodations. (("Accommodation Plan") (ECF No. 107-5).) In her Accommodation Plan, Plaintiff listed three main accommodations. In the first requested accommodation, Plaintiff stated that she needed to inform the students, parents and co-workers of her specific allergies and ask them not to wear those particular products or scents. (Accommodation Plan at 2.) She proposed to send a letter to the parents that read:

7

Dear parents/guardians,

This note is to let you know that your child's language arts teacher, Dr. Wendi Anderson, is highly allergic to many scented lotions, perfumes, hand sanitizers, and body sprays (such as AXE and Victoria's Secret), and other topical products with chemically created scents in them. The most distressing scents to her system are vanilla, cocoa butter, coconut, florals, fruits, musks, and patchouli. Even a single spray or use of deodorants with these scents on the body or clothing from early in the morning can cause her to have difficulty breathing and other severe respiratory difficulties.

This school year, she has had a number of reactions already, which have heightened her sensitivity. We are asking that you understand that in order to teach your child effectively, she will need to be in a classroom free of scented topical products. We understand that there are occasions in which students wear lightly scented products that they do not even realize will cause a strong reaction for their teacher. At these times, your child will still receive instruction from Dr. Anderson, provided she is able to move your child or the class to our common area where we often do small group instruction or at the doorway area of the classroom where your child can still participate without causing the chemicals to build up in the classroom. The class may need to move elsewhere if the commons is not available.

If Dr. Anderson is unable to continue teaching due to a reaction that she was unable to foresee, she may have to leave class in order to keep her from going into further respiratory distress.

Thank you very much,
Patricia McMahon, PhD, and Dr. Wendi Anderson

(Accommodation Plan at 4.) The proposed letter included a place for the parent to sign and return the letter indicating that they would do their best to help keep the classroom environment safe for Plaintiff.

For the second accommodation, Plaintiff stated that she would need to inform any student wearing a reaction-causing scent that he or she has on such a scent, and move that student out of the class area. (Accommodation Plan at 12.) For the third accommodation, Plaintiff proposed moving the entire classroom to another location if a student wore an offending scent. (Accommodation Plan at 13.) Plaintiff also proposed calling home for a student who repeatedly wore scents that caused her a reaction. (Accommodation Plan at 13.)

8

On September 25, 2017, Dr. McMahon authorized Plaintiff to send a letter home to parents. (McMahon Decl. ¶ 15; Anderson Dep. at 334:13-336:19.) The first paragraph of the letter contained the exact language as the first paragraph of the letter proposed by Plaintiff in her Accommodation Plan. (Ex. E to McMahon Decl.) The second paragraph included language similar to that which Plaintiff had previously proposed: "This school year, she has had a number of reactions already, which have heightened her sensitivity. Therefore, we ask that Dr. Anderson's students refrain from wearing scented topical products when they will be in her classroom." (Ex. E to McMahon Decl.) The letter did not include the language about removing students or any other language. Both Plaintiff and Dr. McMahon signed the letter. (Ex. E to McMahon Decl.)

On September 26, 2017, Dr. McMahon visited each of Plaintiff's four classes and informed the students of the letter, provided each student a copy and read it aloud. (McMahon Decl. ¶ 15; Anderson Dep. at 334:13-336:19.) Dr. McMahon informed the students that when Plaintiff wore a mask, moved students into the commons, or worked only on certain sides of the room, she did so because she had identified an allergen in the room. (McMahon Decl. ¶ 15.)

Plaintiff met with Dr. McMahon to discuss her accommodations on September 7, 2017, September 25, 2017, and October 16, 2017. (McMahon Decl. ¶ 16.) Plaintiff continued to teach between mid-October 2017 and April 2018 without being allowed to freely remove individual students from her classroom. (McMahon Decl. ¶ 28.) During this period, Plaintiff did not report any additional reactions or request additional accommodations. (McMahon Decl. ¶ 28.) On April 13, 2018, Plaintiff submitted sick leave requests and did not return to work. (McMahon Decl. ¶ 29.) On April 20, 2018, Plaintiff began taking FMLA leave. (McMahon Decl. ¶ 29.)

Plaintiff took unpaid leave for the duration of the 2018-19 school year before her disability retirement began in June 2019.  (McMahon Decl. ¶ 29.)

**E.      Difficulties Implementing Plaintiff's Requested Accommodations**

Individuals moved throughout the school during the course of the day.  (McMahon Decl. ¶ 19.)  This made it difficult to keep students wearing triggering scents away from Plaintiff. (McMahon Decl. ¶ 19.)  Providing Plaintiff with an environment free of her allergens would have required verifying that each individual who entered her classroom had not used any of the identified scents or wore clothes laundered with an offending detergent.  (McMahon Decl. ¶ 20.) It would also require monitoring the entire school building, including the locker rooms, throughout the day to ensure that individuals did not use any offending products during the course of the day.  (McMahon Decl. ¶ 20.)  Likewise, it would involve telling students and parents that they could not use certain hygiene and cleaning products in their own homes. (McMahon Decl. ¶ 20.)  The school lacked the personnel to enforce an environment free of Plaintiff's allergens.  (McMahon Decl. ¶ 21.)

Jordan Krevonick had served as Page Middle School's guidance counselor since August 2015.  (Decl. of Jordan Krevonick ("Krevonick Decl.") (ECF No. 93-13) ¶ 2.)  Krevonick spoke to a student who expressed her frustration that Plaintiff singled her out for the laundry detergent used by her parents at home.  (Krevonick Decl. ¶ 3.)  When a student used a laundry detergent that triggered a reaction, Plaintiff preferred to transfer that student to a different class. (Anderson Dep. at 165:2-168:4.)

Krevonick fielded complaints from other students who felt singled out by Plaintiff. (Krevonick Decl. ¶ 6.)  Other administrators received similar reports of Plaintiff singling out students for particular scents.  (Decl. of Roger Gross ("Gross Decl.") (ECF No. 93-10) ¶¶ 4-5.)

10

In Krevonick's experience, "when a teacher singles out or embarrasses a student, that interaction can negatively impact their relationship, which in turn can affect the student's performance in that class." (Krevonick Decl. ¶ 7; *see also* McMahon Decl. ¶ 23 (same).)

## II.    PROCEDURAL POSTURE

On October 30, 2018, Plaintiff filed her original Complaint. (ECF No. 1.) On April 1, 2019, she filed an eight-count Amended Complaint against Defendant, Dr. McMahon, and Gwyn Ciemniecki, the Executive Director of Human Resources & Compliance for Gloucester County Public Schools. (Am. Compl. (ECF No. 9) ¶¶ 2-4.) On May 29, 2020, the Honorable M. Hannah Lauck, U.S. District Court Judge, granted in part and denied in part Dr. McMahon's, Cieminiecki's and Defendant's Motion to Dismiss, and dismissed all counts in the Amended Complaint except Count I (Failure to Provide Reasonable Accommodations Under the ADA) against Defendant, leaving it as the only remaining Defendant. (ECF No. 17.) On October 29, 2021, this case was reassigned from Judge Lauck to the undersigned. (ECF No. 89.)

That same day, Defendant filed a Motion to Exclude the Testimonies and Reports of Plaintiff's Expert Witnesses (ECF No. 90), moving to exclude the testimonies and expert reports of Alan R. Vinitsky, M.D. ("Dr. Vinitsky"), Nancy Didriksen, Ph.D. ("Dr. Didriksen") and H. Gray Broughton ("Mr. Broughton"). Dr. Vinitsky served as Plaintiff's treating physician and diagnosed her with Multiple Chemical Sensitivity ("MCS"). On January 10, 2022, following a hearing, the Court granted the Motion to Exclude as to Dr. Vinitsky, because Dr. Vinitsky's diagnosis of MCS lacked reliability and the medical community has not accepted MCS as a diagnosis. (Mem. Op. Gr. Mot. to Exclude ("Daubert Op.") (ECF No. 104).) The Court granted the Motion to Exclude as to Dr. Didriksen, because Dr. Didriksen failed to appear at the hearing, and counsel for Plaintiff abandoned Dr. Didriksen as an expert witness. (Daubert Op. at 1, n.1.)

11

On January 20, 2022, Defendant filed a Supplemental Memorandum in Support of Defendant's Motion for Summary Judgment. (ECF No. 106.) On February 3, 2022, Plaintiff filed her Opposition. (ECF No. 107.) On February 9, 2022, Defendant filed its Reply. (ECF No. 108.) This matter is now ripe for review.

### III.   STANDARD OF REVIEW

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the movant properly supports the motion, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

The relevant inquiry in a summary judgment analysis focuses on "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255. Moreover, the Court cannot weigh the evidence to enter a judgment, but simply must determine whether a genuine

12

issue for trial exists. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (quoting *Anderson*, 477 U.S. at 249).

Once the moving party properly submits and supports a motion for summary judgment, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; instead, there must be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-48. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Indeed, the Court must grant summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp*, 477 U.S. at 322. To defeat an otherwise properly supported motion for summary judgment, the non-moving party "must rely on more than conclusory allegations, 'mere speculation,' the 'building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of some 'metaphysical doubt' concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, allows a reasonable factfinder to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

## IV.   ANALYSIS

Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). "A qualified individual is an individual who,

with or without reasonable accommodation, can perform the essential functions of the employment position." *Wilson v. Dollar General Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (quoting 42 U.S.C. § 12111(8)). The plaintiff bears the burden to establish that she constitutes a qualified individual. *Halpern v. Wake Forest Univ. Health Servs.*, 669 F.3d 454, 462 (4th Cir. 2012). Unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." 42 U.S.C. § 12112(b)(5)(A).

Accordingly, to establish a failure to accommodate claim under the ADA, a plaintiff must prove: "(1) that she had a disability within the statutory meaning; (2) that the employer knew of her disability; (3) that a reasonable accommodation would permit her to perform the essential functions of the position; and (4) that the employer refused to make the accommodation." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 (4th Cir. 2021), *cert denied*, 142 S. Ct. 767 (2022). If a plaintiff meets this showing, the employer can defeat the failure-to-accommodate claim by "demonstrating that the reasonable accommodations would impose an undue hardship." *Id.* The parties dispute the first, third and fourth element of Plaintiff's case. The Court will address each in turn.

### A.  Plaintiff's Disability

The parties disagree as to whether Plaintiff suffers from a disability. Plaintiff claims that she suffers from a sensitivity to fragrances, which substantially limits her working, breathing and brain functions. Defendant argues that Plaintiff cannot show that she has a disability, because she can present no evidence that MCS substantially limits one of her major life activities now that the Court has excluded the testimony of Dr. Vinitsky.

The ADA defines a disability as "a physical or mental impairment that substantially

14

limits one or more major life activities." 42 U.S.C. § 12102(1)(A).  An impairment means "any

physiological disorder or condition" that affects "one or more body systems," such as the

neurological, special sense organs, respiratory, digestive or immune systems.  28 C.F.R.

§ 36.105(b)(1)(i).  "[N]ot every impairment will constitute a disability within the meaning of this

section," but it meets the definition if "it substantially limits the ability of an individual to

perform a major life activity as compared to most people in the general population."  *Id.*

§ 36.105(d)(1)(v).  The ADA provides a nonexhaustive list of major life activities, including

"seeing, hearing . . . speaking, breathing, learning, reading, concentrating, thinking,

communicating, and working."  42 U.S.C. § 12102(2)(A).

   In 2008, Congress passed the ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325,

broadening the definition of "disability," with the intent to "make it easier for people with

disabilities to obtain protection under the ADA."  *Jacobs v. N.C Admin. Off. of the Cts.*, 780 F.3d

562, 572 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.1(c)(4)).  The implementing regulation

clarifies that "[t]he primary object of attention in cases brought under the ADA should be

whether covered entities have complied with their obligations and whether discrimination has

occurred, not whether the individual meets the definition of disability."  *Id.*  Further, whether an

impairment substantially limits a major life activity "will not require scientific, medical, or

statistical analysis."  29 C.F.R. §1630.2(j)(1)(v).

   Here, Plaintiff claims that she has a sensitivity to certain fragrances, which causes

reactions, including:  pain in the throat and mouth, making talking difficult; difficulty breathing;

excessive coughing; cognitive dysfunction; diarrhea; blurry vision; headaches; and, the need to

leave the classroom and take antihistamines.  To support this claim, she has submitted the

declaration and treatment notes from Burris, her treating family nurse practitioner. (("Burris Decl.") (ECF No. 107-11).)

Plaintiff also submitted an expert report of Dr. Vinitsky. However, the Court has excluded Dr. Vinitsky from testifying, because MCS does not constitute a recognized medical diagnosis. Defendant argues that this exclusion renders Plaintiff unable to show that she suffers from a disability. Additionally, Defendant submitted the expert report of Dr. Edward Peck, who opined that Plaintiff's scent sensitivity did not cause her complained-of cognitive impairments. (("Peck Decl.") (ECF No. 93-16) at 17.) Additionally, Dr. Peck opined that Plaintiff suffers from Undifferentiated Somatoform Disorder, a mental disorder characterized by recurring physical complaints. (Peck Decl. at 17-18.) However, Dr. Peck did not address specifically whether all of Plaintiff's complained-of physical impairments resulted from the Undifferentiated Somatoform Disorder and, instead, he opined generally on the diagnosis. (Peck Decl. at 17-19.)

The exclusion of Dr. Vinitsky's report and testimony does not completely doom Plaintiff's claim to a disability, as Defendant argues. Regardless of whether MCS presents a viable medical diagnosis, Plaintiff still presents evidence that, if credited by the jury, her sensitivity to scents causes reactions that substantially limit her ability to perform major life activities. The Court analyzes the evidence on this issue mindful of the expansive definition of the term "disability" imposed under the ADAAA. Likewise, the Court heeds the Fourth Circuit's emphasis that the courts should focus on the employer's efforts to accommodate rather than "whether the individual meets the definition of disability." *Jacobs*, 780 F.3d at 572. The jury ultimately could find that Plaintiff has not proven that she suffers from a disability or that a mental disorder such as Undifferentiated Somatoform Disorder actually causes her physical symptoms. However, viewing the facts in the light most favorable to Plaintiff, the Court finds

16

that the question of Plaintiff's disability presents a genuine dispute of material fact for the jury to decide.

### B.     The Reasonableness of the Requested Accommodation

The parties also dispute whether Plaintiff requested a reasonable accommodation that would have allowed her to perform the essential duties of her job.  Thus, the Court starts with the essential duties of the job.  The job description contains a list of 22 essential duties, including, in relevant part:

1.  Meets and instructs classes in the locations and at the times designated;

2.  Plans a program of study that, as much as possible, meets the individual needs, interests, and abilities of the students and state and local objectives;

3.  Creates a classroom environment that is conducive to learning and appropriate to the maturity and interests of the students;

4.  Prepares for classes assigned, and shows written evidence of preparation upon request of immediate superior;

5.  Employs a variety of instructional techniques and instructional media, consistent with the physical limitations of the location provided and the needs and capabilities of the individuals or student groups involved.

(Ex. A to McMahon Decl.)

The inquiry as to whether Plaintiff could have performed the essential duties with a reasonable accommodation proceeds in two steps.  First, the Court asks, "was the specific accommodation requested by [Plaintiff] reasonable?" *Jacobs*, 780 F.3d at 580.  Next, the Court asks if, had Defendant granted the accommodation, could Plaintiff have performed the essential functions of the position? *Id.*  The Court answers both questions in the negative.

17

A "reasonable accommodation includes a modification or adjustment to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." *Perdue*, 999 F.3d at 959-60 (internal quotations omitted). The ADA includes a non-exhaustive list of accommodations, which includes "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, or other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

For a plaintiff to defeat summary judgment, she must "present evidence from which a jury may infer that the identified accommodation is reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Perdue*, 999 F.3d at 960. A reasonable accommodation "is one that is feasible or plausible," and need not match "the exact accommodation that the employee requested." *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414-15 (4th Cir. 2015). Importantly, federal law only mandates a reasonable accommodation, but it does not require "substantial or fundamental modifications to accommodate persons with disabilities." *Halpern*, 669 F.3d at 464. Indeed, a "request for accommodation may be so broad or indeterminate as to render it 'unreasonable on its face.'" *Call v. Panchanathan*, 2021 WL 4206423, at *4 (E.D. Va. Sept. 15, 2021) (quoting *Halpern*, 669 F.3d at 464)).

Here, the parties dispute the precise accommodations that Plaintiff sought. Plaintiff claims that she requested the following accommodations:

1. The opportunity to inform students, parents and co-workers of her specific scent allergies and ask them not to wear the triggering scents;

18

2. The ability to move the person out of the class area if exposed to an offending scent or allergen;

3. The ability to move the entire classroom to another location;

4. The ability to refer students who continue to wear offending scents to the administration; and,

5. That she wear a mask when necessary.

(Accommodation Plan at 7-14.) Informing her students involved sending a letter home at the beginning of the year informing the students that their language arts teacher:

> is highly allergic to many scented lotions, perfumes, hand sanitizers, and body sprays (such as AXE and Victoria's Secret), and other topical products with chemically created scents in them. The most distressing scents to her system are vanilla, cocoa butter, coconut, florals, fruits, musks, and patchouli. Even a single spray or use of deodorants with the scents on the body or clothing from early in the morning can cause her to have difficulty breathing and other severe respiratory difficulties.

(Accommodation Plan at 11.)

In response, Defendant offered the following accommodations:

1. In the event of a reaction, Plaintiff could notify the main office so that someone could cover her class and Plaintiff could remove herself from the classroom;

2. Plaintiff could move her class to other locations without administrative approval;

3. A letter was sent home to all students, parents and staff informing them of increased allergies and requesting that students not bring any fragrances, deodorant or other aerosols, perfumes, air fresheners and perfumed hand lotions to school. The school sent a subsequent letter providing a more detailed explanation of the offending scents and requested that students refrain from wearing scented topical products while in her classroom;

4. Dr. McMahon and school counselors visited each of Plaintiff's classes and informed them of the letter and Plaintiff's allergies;

5. Allergy awareness signs were posted; and,

6. Dr. McMahon directed the custodial staff to use only warm water and unscented products to clean Plaintiff's classroom.

(McMahon Decl. ¶¶ 6-16.)

Defendant claims that Plaintiff's requested accommodation amounts to demanding a scent-free environment, which constitutes an unreasonable request as a matter of law. The law supports this argument. As the Court recently explained, "[a]s several courts have persuasively concluded in analogous circumstances, a request to ban an indeterminate list of scented chemicals imposes unduly burdensome issues of administration on an employer and is thus unreasonable as a matter of law." *Call*, 2021 WL 4206423, at *4 (collecting cases).

That Plaintiff worked in a school only heightens the unreasonableness of the request. In rejecting a similar claim brought by a teacher who claimed to suffer from MCS, the Western District of North Carolina stated that "[a] public school could never be free from any objectionable smell or any deodorant, perfume, cologne, hand lotion, or cleaning products." *Feldman v. Charlotte-Mecklenburg Bd. of Educ.*, 2012 WL 3619078, at *7 (W.D.N.C. Aug. 21, 2012). As many as 700 individuals came into Page Middle School on any given day, rendering it nearly impossible to police the smells that may have entered the building. (McMahon Decl. ¶ 4.) Even limiting this consideration to the individuals with whom Plaintiff interacted — over sixty each day by Plaintiff's count — enforcement remained implausible. Moreover, in many instances, only Plaintiff could detect the offending scent, rendering enforcement by school officials even more difficult. Aside from the logistical difficulties of ferreting out offending

20

scents, Plaintiff's proposed accommodations imposed on the School that it make an unreasonable request of the students and families. For instance, Plaintiff sought to ask parents to change the laundry detergent or hair products that they used in their home. (Krevonick Decl. ¶ 4.) Such an intrusion into the students' homes goes well beyond a reasonable request that a school could make of its students.

Plaintiff responds that she did not demand a scent-free environment and, instead, only required an environment free of the scents that she identified. This argument fails. Even if Plaintiff did not seek a strictly scent-free environment, her request approaches that. She requested an environment free from "all scented topicals." (Accommodation Plan at 1.) Additionally, Plaintiff identified a broad range of scents that included several open-ended fragrance categories, including "vanilla, cocoa butter, coconut, florals, fruits, musks, and patchouli." (Accommodation Plan at 11.) These base fragrances appear in a wide variety of substances, such that Plaintiff's request would still encompass a wide variety of hygiene and cleaning products. Indeed, Plaintiff refers to these as the "7 fragrance categories," recognizing that each category contains a larger number of scents. (Pl.'s Opp. at 19.)

In addition to the overbreadth of the requested accommodation, the Court finds Plaintiff's request to remove individual students from the classroom unreasonable. Plaintiff's request for accommodation included the ability to speak with a student and move a student out of the classroom. (Accommodation Plan at 12.) Plaintiff argues that this does not amount to "singling out" students based on their fragrances. Regardless of the nomenclature used, Plaintiff sought to individually address a specific student if she detected a triggering scent on that student, discuss that scent with the student and move the student out of the classroom, while the rest of the students remained in the classroom. This solution has two problems. As Defendant points out

21

with testimony from multiple educators, this proposed solution would have had a negative effect on the student and their performance in school. (*See, e.g.,* Krevonick Decl. ¶7 ("In my experience working with middle-school-age students, when a teacher singles out or embarrasses a student, that interaction can negatively impact their relationship, which in turn can affect the student's performance in that class.").)

Second, Plaintiff fails to articulate how this student would continue to receive the same level of instruction as those students remaining in the classroom. Plaintiff claims that individual students regularly used the flexible workspace outside of the classroom for students to work independently, in small groups or in large groups. ((Decl. of Terri Penick (ECF No. 107-3) ¶ 9.) However, as described by Terri Penick, these teachers used the flexible workspaces for instructional purposes. Plaintiff's proposed use of the flexible workspace stemmed from a need divorced of any instructional purpose for the student, but instead resulted from her own personal health reasons. Plaintiff presents no evidence of how a student who must suddenly move outside of the classroom could still have received the same level of instruction as those inside the classroom.

Furthermore, the Court must defer to Defendant's discretion with respect to allowing Plaintiff to remove students from the classroom. The Fourth Circuit has explained the deference that courts must give to employers when determining accommodations:

> The actor responsible in the first instance for reducing this wide solution-space to a concrete accommodation is not the judiciary, or even the disabled employee — it is the employer. To the extent an employee may be accommodated through a variety of measures, the employer, exercising sound judgment, possesses 'ultimate discretion' over those alternatives. Such is the established position of this circuit, as well as that of every other circuit that has ruled on the matter. Provided the employer's choice of accommodation is 'reasonable,' not even a well-intentioned court may substitute its own judgment for the employer's choice.

22

*Elledge v. Lowe's Home Cntr., LLC*, 979 F.3d 1004, 1011-12 (4th Cir. 2020) (cleaned up).  Here, the school bears responsibility for ensuring the education and safety of each of its students. Defendant has submitted testimony from multiple administrators that they would not allow Plaintiff to remove students from the classroom based on scent.  Plaintiff has not presented evidence to contradict Defendant's claim that removing students from the class would have resulted in educational harm.  Accordingly, the Court must defer to Defendant's judgment that removing students from the classroom did not constitute a viable option.  Therefore, Plaintiff did not request a reasonable accommodation.

The second step of the inquiry likewise dooms Plaintiff's claim.  Plaintiff must also show that, with the requested accommodations, she could have performed the essential duties of her job.  This, Plaintiff cannot do.

The precise breadth of Plaintiff's requested accommodation remains unclear.  The list of banned products proposed by Plaintiff included hand sanitizers; lotions; body sprays; topicals containing vanilla, coconut, floral/fruity scents; cocoa butter; musks; and, patchouli. (Accommodation Plan at 2.)  A plain reading of this list suggests that Plaintiff requested the exclusion of *all* hand sanitizers, lotions, body sprays, cocoa butter, musks and patchouli, in addition to the exclusion of all topicals that contained vanilla, coconut or floral/fruity scents. Plaintiff testified that this list intended to qualify all of the products (hand sanitizers, lotions, body sprays) with the specific scents listed with topicals.  (Anderson Dep. at 111-12.)  It remains unclear, but Plaintiff's claim fails regardless of the breadth.

Taking a narrow view of the fragrances that Plaintiff needed removed from her classroom, as Plaintiff advances during the reasonableness inquiry, the Court finds that Plaintiff could not have performed the essential duties of her job with the exclusion of only those

fragrances. In the medical records submitted by Plaintiff, Sharron Burris opines that "[t]he only way to accommodate her to prevent these reactions is a completely 'scent-free' classroom but her employer is unwilling to comply [with] this." (Burris Decl. at 8.) As the Court discussed previously, requesting such a scent-free environment would be unreasonable as a matter of law.

Moreover, regardless of the breadth of the list, it did not include laundry detergent or chewing gums that may have a fruity or floral flavor. Instead, it included only topicals, sprays, lotions or hand sanitizers containing those scents. However, Plaintiff testified that she experienced reactions caused by laundry detergent. (Anderson Dep. at 164:7-166:20.) Plaintiff admits that "laundry detergent was not on her written requests for accommodation." (Pl.'s Opp. at 23.) Likewise, Plaintiff had a bad reaction to a student's orange-flavored gum (Anderson Dep. at 207:9-20), although gum does not appear on her list of triggering substances.

This leaves Plaintiff with two options, both of which render her unable to defeat summary judgment. If the Court takes the narrow view of the list of fragrances that she wanted eliminated from her classroom, then she could not perform the essential duties of her job, because she would have suffered reactions caused by other substances allowed in the classroom (i.e., orange gum or detergent). If the Court broadly reads the fragrances that Plaintiff wanted eliminated from the room, then her overbroad request was unreasonable as a matter of law.

Likewise, Plaintiff cannot prove that she could have performed the essential duties of her job if she removed students from the classroom for offending scents. Removing a student from the classroom for non-instructional or non-disciplinary reasons does not constitute "creat[ing] a classroom environment that is conducive to learning and appropriate to the maturity and interests of the students." (Ex. A to McMahon Decl.) Nor does it constitute "employ[ing] a variety of instructional techniques and instructional media, consistent with the physical limitations of the

location provided and the needs and capabilities of the individuals or student groups involved."
(Ex. A to McMahon Decl.)  Instead, it removes a child from the classroom based not on the
needs and capabilities of the student, but of the teacher.  Likewise, this proposed accommodation
would have prevented her from "meet[ing] and instruct[ing] classes in the locations and at the
times designated."  (Ex. A to McMahon Decl.)  Accordingly, Plaintiff could not have performed
the essential duties of her job if she had removed students from the classroom.

Plaintiff argues that Defendant allowed her the requested accommodations in previous
years that it later denied her, and that she performed the essential duties of her job with those
accommodations.  Even if true, Defendant did not need to grant an unreasonable accommodation
simply because it had previously accommodated Plaintiff.  Offering discretionary
accommodations does not raise the legal standard for accommodations moving forward. *Perdue*,
999 F.3d at 961 (holding that a prior decision to grant a job-share did not require the employer to
accommodate with a subsequent job-sharing arrangement); *Myers v. Hose*, 50 F.3d 278, 284 (4th
Cir. 1995) ("Discouraging discretionary accommodations would undermine Congress' stated
purpose of eradicating discrimination against disabled persons."); *Vande Zande v. Wis. Dep't of
Admin.*, 44 F.3d 538, 545 (7th Cir. 1995) (An employer that "bends over backwards to
accommodate a disabled worker . . . must not be punished for its generosity by being deemed to
have conceded the reasonableness of so far-reaching an accommodation.").  Accordingly, the
accommodations previously offered to Plaintiff do not bear on the reasonableness of the
accommodations that it offered during the 2017-18 school year.

Even construing the facts in a light most favorable to Plaintiff, she cannot meet her
burden on the third element of her claim.  She had not requested a reasonable accommodation,

and making the requested accommodations more reasonable would render her unable to perform the essential duties of the job.

### C.     Failure to Provide Reasonable Accommodation

The fourth element of Plaintiff's claim requires her to show that Defendant refused to provide a reasonable accommodation. However, this element presumes that Plaintiff requested a reasonable accommodation. Under this element, if an employee fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of her position, then an employer will not face liability for refusing an accommodation. *See Perdue*, 999 F.3d at 962 (holding that employer could not be held liable for failing to engage in the interactive process, because the employee had failed to demonstrate the existence of a reasonable accommodation).

Here, Defendant offered numerous accommodations to Plaintiff. Defendant allowed for the posting of a sign in Plaintiff's classroom, allowed for Plaintiff to send multiple letters home regarding her scent sensitivities, allowed her to move her entire class to another available location, had the principal and guidance counselor speak to Plaintiff's classes regarding her scent sensitivity, and allowed someone to cover Plaintiff's class so that she could leave in the event of a reaction. (McMahon Decl. ¶¶ 8-15.) As discussed above, Plaintiff has not identified any reasonable accommodations beyond those afforded her by Defendant that would allow her to perform the essential functions of her job. Accordingly, Plaintiff cannot meet the fourth element of her prima facie case.

### V.     CONCLUSION

Construing the facts in the light most favorable to Plaintiff, the Court finds that she cannot establish that a genuine dispute of a material fact exists as to whether Defendant refused

26

to offer her a reasonable accommodation that would have allowed her to perform the essential

duties of her job.  As a matter of law, Plaintiff cannot meet her burden under the ADA.  For the

reasons stated above, the Court will GRANT Defendant's Motion for Summary Judgment (ECF

No. 92).

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____/s/_____

David J. Novak
United States District Judge


Richmond, Virginia
Dated:  March 10, 2022